UNITED STATES, Appellee

v

WILLIAM R. KIRSCH, Private, U. S. Army, Appellant

15 USCMA 84, 35 CMR 56

No. 17,519

October 16, 1964

*Captain Daniel H. Benson* argued the cause for Appellant, Accused. With him on the brief was *Colonel Joseph L. Chalk.*

*Captain William L. Leonard* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Francis M. Cooper.*

Opinion of the Court

QUINN, Chief Judge:
 Although given a grant by Major

General B. F. Taylor, Commander of the 24th Infantry Division, which re-

cited he would have "immunity from prosecution for any offense" he might testify to at the trial of a fellow soldier, the accused refused to answer questions asked him by trial counsel, on the ground his answers would tend to incriminate him. Thereafter, he was charged with, and pleaded guilty to, willful refusal to testify, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. Notwithstanding his plea of guilty, the accused now contends his conviction is illegal because General Taylor's grant of immunity could not deny him the right to rely upon the privilege against self-incrimination.

During 1962, the accused's friend, Private First Class John D. Roumanis, allegedly became associated with a Greek national who was believed to be a Soviet agent. At the purported agent's request, Roumanis procured and turned over to him several items of military equipment. An investigation into Roumanis' activities indicated the accused and other soldiers were probably involved in other transactions with the Greek national. In late 1962, the accused was formally charged, under Articles 81 and 134 of the Uniform Code, supra, 10 USC §§ 881 and 934, respectively, with conspiracy to obtain and deliver instruments connected with the national defense to the agent of a foreign nation, in violation of 18 USC § 793, and with wrongful delivery of such instruments, in violation of the same statute. Eventually, except for a single specification of larceny of a M-14 rifle, all charges were dropped. About the same time, charges of conspiracy to sell, and the wrongful sale of, military property were laid against Roumanis. On March 19, 1963, the accused was tried and acquitted of the charge of larceny. On the afternoon of March 21, Roumanis went to trial on the charges against him. That day, trial counsel delivered to the accused a document titled "Grant of Immunity." The document was issued by Major General B. F. Taylor, commanding officer of the accused's division and the convening authority of the court-martial before which Roumanis was on trial. In substance, the grant stated the accused was "granted immunity from prosecution for any offense concerning which" he might testify as a witness at Roumanis' trial. The next day, March 22, the accused was called as a Government witness. He responded to some questions about his acquaintanceship with Roumanis; but when asked if he went to the Cafe Popp, in Munich, with Roumanis in April 1962, he said that on advice of counsel he rested on his rights under "the Fifth Amendment . . . and Article 31." The law officer immediately cautioned the court-martial to draw no adverse inference against Roumanis from the accused's statement. He then held an out-of-court hearing to consider the accused's contention. Reviewing General Taylor's grant, he advised the accused it gave him immunity from prosecution by the United States for any offenses as to which he might testify as a witness. He also informed the accused that erroneous advice of counsel was no defense to a charge of willful refusal to testify. See Ullmann v United States, 350 US 422, 100 L ed 511, 76 S Ct 497 (1956); Dennis v United States, 171 F2d 986 (CA DC Cir) (1948), affirmed 339 US 162, 94 L ed 734, 70 S Ct 519 (1950). And he reminded the accused that willful refusal to testify was a serious military offense carrying a punishment extending to dishonorable discharge and confinement at hard labor for five years. The accused acknowledged his understanding of the law officer's explanation and ruling on the effect of the grant of immunity, but persisted in his refusal to answer questions by trial counsel relating to his relationship with Roumanis and the Greek national, other than to repeat that on "advice of . . . [his] counsel" he stood "firmly on the Fifth Amendment . . . and Article 31."[1]

Within a week of his refusal to testify at Roumanis' trial, the present charge was lodged against the accused. For reasons which may be inferred from the provisions of a pretrial agreement with the convening authority, the accused entered a plea of guilty when the

---

[1] Roumanis was acquitted of the charges on a motion for a finding of not guilty.

case came up for trial.[2] On this appeal, he contends the plea of guilty should be set aside, and the charge dismissed, because the grant of immunity tendered him was either void in its entirety, or ineffectual to protect him against prosecution in a United States district court. What the argument amounts to is that the specification fails to state an offense in violation of the Uniform Code of Military Justice, in that General Taylor had no power to issue a grant of immunity. See Grimm, "Grants or Promises of Immunity Under Military Law" (Thesis, The Judge Advocate General's School, United States Army, Charlottesville, Virginia, April 1957).

A plea of guilty does not foreclose appellate consideration of the legal sufficiency of the ▌ specification. United States v Fout, 3 USCMA 565, 13 CMR 121.

Central to the accused's position is the principle that no person "shall be compelled in any criminal case to be a witness against himself." Amendment V, United States Constitution; Article 31(a), Uniform Code of Military Justice, 10 USC § 831; United States v Eggers, 3 USCMA 191, 11 CMR 191.

The right to exercise the privilege does not exist, however, if ▌ there is no possibility that ▌ the witness will thereafter be subject to a criminal prosecution for any offense previously committed by him which is disclosed by his testimony. Brown v Walker, 161 US 591, 598, 40 L ed 819, 16 S Ct 644 (1896). Thus, it has been held that "once a witness has been convicted for the transactions in question, he is no longer able to claim the privilege of the Fifth Amendment and may be compelled to testify." United States v Romero, 249 F2d 371, 375 (CA 2d Cir) (1957); United States v Gilliland, 10 USCMA 343, 27 CMR 417. An acquittal or other jeopardy has the same effect.[3] Wigmore, Evidence, § 2279 (McNaughton rev 1961). So, too, does a valid grant of immunity. Of the last, the Supreme Court of the United States has said: "Immunity displaces the danger" of criminal liability and eliminates the privilege against self-incrimination. Ullmann v United States, supra, at page 439. Appellate defense counsel acknowledge the principle, but contend the authority to grant immunity must be grounded in a constitutional or statutory provision because it represents the "power to annul . . . the statutory law of crimes." Doyle v Hofstader, 257

---

[2] Before acceptance of the plea, the law officer asked the accused to confer again with his counsel. The matter was considered between the accused and his civilian and military lawyers, and the accused persisted in his plea. A good faith but legally mistaken belief in the right to remain silent does not constitute a defense to a charge of willful refusal to testify. Dennis v United States, 171 F2d 986 (CA DC Cir) (1948), affirmed 339 US 162, 94 L ed 734, 70 S Ct 519 (1950); Williamson v United States, 207 US 425, 52 L ed 278, 28 S Ct 163 (1908); Ullmann v United States, 350 US 422, 100 L ed 511, 76 S Ct 497 (1956). Thus, the accused took the risk that the grant of immunity was legally effective to shield him from further prosecution for any offenses that might be connected with, or disclosed or uncovered by, his testimony. Braden v United States, 272 F2d 653 (CA 5th Cir) (1960), affirmed 365 US 431, 5 L ed 2d 653, 81 S Ct 584 (1961).

[3] If the questions asked the accused had been framed to encompass only the essential facts of the offense for which he was tried and acquitted, he could not rely upon the privilege against self-incrimination, regardless of the validity vel non of the grant of immunity by General Taylor. See United States v Chase, 281 F2d 225 (CA 7th Cir) (1960). However, the inquiry about a meeting with Roumanis and the Greek national might have forged a link in a chain of evidence leading to a charge of conspiracy, especially in view of the original charges which were not referred to trial. See Hoffman v United States, 341 US 479, 95 L ed 1118, 71 S Ct 814 (1951). If not otherwise protected against prosecution for conspiracy, the acquittal on the larceny charge did not "displace the danger," and the accused could assert the privilege against self-incrimination.

NY 244, 177 NE 489, 495 (1931); see also United States v Ford, 99 US 594, 25 L ed 399 (1879). They admit that in a number of cases, this Court apparently assumed the existence of power in a general court-martial authority to grant immunity to a witness to free him from fear of prosecution for offenses committed by him which might be revealed in his testimony, but they maintain the point was never specifically considered and decided. See United States v Gilliland, supra; United States v White, 10 USCMA 63, 27 CMR 137. They contend there is no statute which sanctions the grant by a general court-martial authority of immunity against prosecution. The law officer, and the intermediate appellate authorities, held that the necessary authority was apparent in the provisions of the Manual for Courts-Martial, United States, 1951.

Pertinent statements on immunity which appear in the Manual for Courts-Martial are as follows:

"56. WITHDRAWAL OF SPECIFICATIONS. . . .

"b. Grounds for withdrawal.—Proper grounds for the withdrawal of a specification include substantial defect in the specification, insufficiency of available evidence to prove the specification, and the fact that it is proposed to use one of the accused as a witness.

. . . . .

"c. Effect of withdrawal. . . .

If a specification is withdrawn pursuant to a grant of immunity (148e, 150b), such grant of immunity may be asserted as a defense.

. . . . .

"67. MOTIONS RAISING DEFENSES AND OBJECTIONS.—a. Defenses and objections which may be raised. . . .

"Defenses and objections such as that trial is barred by the statute of limitations, former jeopardy, pardon, constructive condonation of desertion, former punishment, promised immunity, lack of jurisdiction, and failure of the charges to allege an offense should ordinarily be asserted by motion to dismiss before a plea is entered; but failure to assert them at that time does not constitute a waiver of the defense or objection. Unless otherwise stated, failure to assert any such defense or objection—except lack of jurisdiction or failure of the charges to allege an offense—before the conclusion of the hearing of the case constitutes a waiver.

. . . . .

"f. Effect of rulings on motion. . . .

. . . . .

". . . [W]hen the trial cannot proceed further as the result of the action of the court on a motion raising a defense or objection, the court will adjourn and submit the record of its proceedings so far as had to the convening authority.

". . . If the convening authority finds that the action of the court was proper but that the defect raised by the motion can be cured, he will take appropriate action to remedy the defect and return the record to the court for trial as above indicated. If he does not wish to return the record for trial, he will take appropriate action to conclude the case by the publication of appropriate orders in cases wherein the action of the court operates as a bar to further prosecution. Generally such action should be taken if the proceedings are terminated by sustaining a motion to dismiss because of former jeopardy, pardon, constructive condonation of desertion, promised immunity, or when findings of not guilty are entered on motion. In other cases, he will take action appropriate under the circumstances.

. . . . .

"68. MOTIONS TO DISMISS. . . .

. . . . .

"h. Promised immunity.—See 148e (Testimony of accomplices).

. . . . .

"148. COMPETENCY OF WITNESSES. . . .

. . . . .

"e. Interest or bias. . . .

. . . . .

"The fact that an accomplice tes-

**89**

tifies for the prosecution does not make him afterwards immune to trial except to the extent that immunity may have been promised him by an authority competent to order his trial by general court-martial. The fact that a witness has obtained a promise of immunity without which he may not have been willing to testify does not disqualify him as a witness.

• • • • •

"150. DEGRADING AND INCRIMINATING QUESTIONS. . . .

"b. Compulsory self-incrimination.

• • • • •

"Although an answer to a question apparently would incriminate or tend to incriminate a witness, he may be required to answer if, because of grant of immunity, former trial, the running of the statute of limitations, or some other reason, he can successfully object to being tried for the offense as to which the privilege is as-serted." [Pages 78–79, 96, 98–99, 104, 276, 277, 278, 283.]

Appellate defense counsel's argument against the Manual as the source of power for general courts-martial authority to grant immunity takes two forms: First, it is contended the President has no legal power to confer upon a military commander the authority to grant immunity; and, secondly, assuming the President possesses the requisite power, the Manual provisions merely recognize the legal consequences of a grant of immunity, but do not themselves empower a general court-martial authority to issue such grants.

In approaching the problem before us, we put aside consideration of the effect of the President's constitutional power "to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment." Article II, § 2, clause 1, Constitution of the United States.[4] We perceive a Congressional grant of power

---

[4] The power was intended by the Founding Fathers to be not merely a means of clemency, but "an instrument of law enforcement" which includes the power to grant immunity to a prospective witness from prosecution for any offenses committed by him. See Corwin, "The President: Office and Powers, 1787–1957," page 158, et seq. It was so used, at least as early as 1807, when Dr. Erick Bollman, called as a witness before the grand jury deliberating on the charges of treason against Aaron Burr, was tendered a pardon by President Jefferson to obviate his reliance upon the privilege of self-incrimination. 1 Burr's Trial, at page 193. In Ex parte Wells, 18 Howard 307 (U.S. 1856), the Supreme Court of the United States cited with approval Lord Coke's observation that an executive pardon can forgive any crime, offense, or punishment before as well as after conviction. In Ex parte A. H. Garland, 4 Wallace 333, 380 (U.S. 1867), speaking of the President's power to grant immunity before trial and conviction, the Supreme Court said the pardon power "may be exercised at any time after . . . [the] commission [of any offense], either before legal proceedings are taken, or during their pendency, or after conviction and judgment." (Emphasis supplied.) In Burdick v United States, 236 US 79, 86, 59 L ed 476, 35 S Ct 267 (1915), President Wilson gave Burdick an " 'unconditional pardon for all offenses' " so he might be interrogated in a grand jury proceeding. Some language in the Court's opinion appears to reflect doubt that the President's power extends to a grant of immunity to a witness for the purpose of freeing him from incrimination by his own testimony. However, the Court specifically deemed it unnecessary to resolve the question, and nothing in the opinion diminishes the broad definition of the President's power as advanced in earlier cases.

Possession of power does not necessarily mean that the right to exercise the power can be delegated to another. There is opinion indicating that exercise of the power must be by the President personally. See United States v Batchelor, 7 USCMA 354, 22 CMR 144; Schwartz, "A Commentary on the Constitution of the United States," volume II, page 94 (1963); Corwin, op cit, supra, page 79. But there is also other opinion that supports the principle of delegability. See Solesbee v Balkcom, 339 US 9, 94 L ed 604, 70 S Ct 457 (1950). As the text points out more fully, Congress has not been circumscribed in the exercise of its own power to grant immunity. See 18 USC § 3486;

to provide immunity from prosecution in the provisions of the Uniform Code; and a valid delineation of a method by which to exercise the power in the Manual for Courts-Martial promulgated by the President.

Under the Uniform Code, a military commander who has information indicating that a person subject to his authority is implicated in the commission of an offense cognizable by courts-martial must "determine what disposition should be made thereof in the interest of justice and discipline." Article 30(b), Code, supra, 10 USC § 830. Paragraph 32d of the Manual for Courts-Martial, supra, elaborates upon the extent of this power. It observes that charges can be dismissed in whole or in part, if the commander decides there are "sound reasons for not punishing the accused with respect to the acts alleged." Appellate defense counsel contend that this power is, at best, comparable to that of a prosecuting attorney to *nolle prosequi* a pending indictment which terminates the preliminary proceedings, but it is not a pardon, and, therefore, does not protect against prosecution if the charge is later revived. See Apodaca v Viramontes, 53 NM 513, 212 P2d 425, 13 ALR2d 1427, 1439 (1949); United States v Ford, supra. We have indeed held that the decision of a general court-martial authority not to refer a pending charge to trial does not operate as a pardon so as to bar prosecution if the charge is reinstituted. United States v Werthman, 5 USCMA 440, 18 CMR 64. The opinion in the *Werthman* case, however, was based largely on the provision in paragraph 32d of the Manual, that the discretion of a commander to dismiss a charge is subject to the order of "competent superior authority." The significance of this condition will be apparent as we develop further the powers granted by Congress. At this point, it suffices to note that *Werthman* does not militate against General Taylor's grant of immunity; and adherence to

it does not require a decision that the grant is legally incapable of barring prosecution of the accused for offenses that might be disclosed in his testimony.

Congress did not merely invest the commander with authority to decide whether to dismiss or drop a charge before trial. It also conferred upon him the power to free an accused from the penalty of any offense committed by him in violation of the Uniform Code, if he believes such action would further the accomplishment of the military mission. By virtue of that power, a commander having court-martial jurisdiction can set aside even a judicial determination of guilt. We commented on the vastness of the power in United States v Massey, 5 USCMA 514, 520, 18 CMR 138, as follows:

". . . The legislative history of the Code makes it clear beyond doubt that the words 'in his discretion' were intended to grant to the convening authority an exceedingly broad power to disapprove a finding or a sentence. Originally these words were absent from the Code's draft. However, from the first the official commentary on the proposed Article 64 of the Code stated that the convening authority 'may disapprove a finding or a sentence for *any* reason.' (Emphasis supplied.) Hearings before the House Committee on Armed Services, 81st Congress, 1st Session, on HR 2498, pages 1182–1183. Mr. Larkin, one of the Code's principal draftsmen, explained that Article 64 'was intended to give him (the convening authority) a free hand in doing anything he wants for any reason in cutting down the sentence or in disapproving.' However, certain members of Congress feared that the phrasing of the Article—as it then stood—was insufficient to make this fully comprehensible. Certain of the colloquy concerning the draftsmen's intention is highly pertinent to the present case:

Ullmann v United States, 350 US 422, 100 L ed 511, 76 S Ct 497 (1956). The considerations that support delegability by Congress would appear to be equally applicable to delegation by the Presi-

dent. Updegraff v Talbott, 221 F2d 342 (CA 4th Cir) (1955); cf. Ludecke v Watkins, 335 US 160, 92 L ed 1881, 68 S Ct 1429 (1948).

'Mr. BROOKS. He (the convening authority) doesn't have to read the record or anything esle (sic). He can just say disapproved and it is through.

'Mr. LARKIN. That is right. In the normal course of the review of the case he looks to its legality and the establishment of the facts and the appropriateness of the sentence and he shouldn't approve anything that is wrong or illegal, but he can disapprove it if it is illegal, if it is wrong, and for any other reason.

'Mr. BROOKS. Or for no reason at all?

'Mr. LARKIN. Or for no reason at all.

'Mr. RIVERS. That is right.

'Mr. LARKIN. The classic case that I think General Eisenhower stated in his testimony before your subcommittee last year was that even though you might have a case where a man is convicted and it is a legal conviction and it is sustainable, that man may have such a unique value and may be of such importance in a certain circumstance in a war area that the commanding officer may say "Well he did it all right and they proved it all right, but I need him and I want him and I am just going to bust this case because I want to send him on this special mission." ' (House Hearings, supra, page 1184.)"

The transcendental nature of the power of a commander having courts-martial authority to exonerate from punishment is further evidenced by the fact that he need not wait until conviction to exercise it. At any stage of the trial he can order the charges withdrawn, and the trial discontinued. Article 44 of the Uniform Code, 10 USC § 844, indicates Congress anticipated a convening authority could, and as the occasion warranted would, withdraw charges after they had been referred to trial. Congress placed no limitation whatever on the exercise of this power. Yet, at the same time it provided, in

92

conformity with the constitutional protection against double jeopardy, that withdrawal of a charge after the introduction of evidence results in the attachment of jeopardy, and thereafter the accused is as fully protected against prosecution as though he had been previously tried and acquitted. Article 44, Code, supra; United States v Johnpier, 12 USCMA 90, 30 CMR 90; United States v Stringer, 5 USCMA 122, 17 CMR 122.

What is the significance of this broad spectrum of power? What name can be given to this aggregate of authority that includes the right to discontinue an investigation into whether a crime has been committed; to dismiss any formal charge that may be made; to direct that a charge previously referred to trial be withdrawn; and, finally, to set aside a determination of guilt by the triers of the facts and the adjudged sentence, and order that the charge be dismissed and the accused be free of any and all punishment prescribed by law for the offenses he committed? What more is embraced in the power of pardon? Combined, the provisions of the Uniform Code confer upon courts-martial authority the power to create an absolute legal bar to prosecution of a person subject to the Code and to his command for any offense in violation of the Code. In our opinion, they comprehend the right to grant immunity from prosecution to a witness to free him from the danger that he may be punished for an offense to which he might be linked by his testimony.

That the totality of power of the courts-martial authority equates to the power to pardon does not exhaust the problem of General Taylor's right to issue the grant before us. The grant did not come about in any of the ways mentioned in the Uniform Code. The question then is whether the forms described in the Code were intended by Congress to be exclusive. Stated otherwise, is an actual court-martial trial essential to effect immunity for a prospective witness? We think not.

Article 36 of the Uniform Code, 10 USC § 836, authorizes the President

to prescribe rules of evidence and modes of proof for courts-martial. Its purpose is to provide means of effectuating the court-martial processes. And its language indicates clearly that Congress anticipated that circumstances might make a rule of the civilian criminal law inappropriate for the military justice system and, conversely, that a rule of narrow application in the civilian community might be especially suitable for wide usage in the military jurisdiction. To be certain that appropriate means could be fashioned to meet the needs, Congress invested the President with broad discretion to choose procedures he deems "practicable" to accomplish the objectives of the Uniform Code. A rule of procedure designed to achieve efficiently and effectively a purpose authorized by statute, without prejudice to any substantial right of a person affected by the rule, is not invalid because other methods could have been selected. See Daley v United States, 231 F2d 123, 125 (CA 1st Cir) (1956), cert den 351 US 964, 100 L ed 1484, 76 S Ct 1028 (1956).

The military establishment is a hierarchy of authority. Every commander is subject to superior authority, with the President being, by Constitutional designation, the Commander-in-Chief. The Uniform Code granted the courts-martial authority having responsibility for the initial review of a conviction, the power to set aside findings of guilt and dismiss the charges, "in his discretion." Article 64, Code, supra, 10 USC § 864. In exercising that power, the commander may consider the policies of his superiors, but he is not, as he would otherwise be, duty bound to do so. See United States v Estrada, 7 USCMA 635, 23 CMR 99. However, in preliminary areas of courts-martial responsibility, the commander's decision is subject to the direction of "competent superior authority." Manual for Courts-Martial, supra; see United States v Schuller, 5 USCMA 101, 108, 109, 17 CMR 101;

United States v Grow, 3 USCMA 77, 11 CMR 77. Command responsibility is present in a decision to withdraw charges that are at trial. The matter is also part of the trial procedure, and, therefore, within the power of the President under Article 36, Code, supra. And, in fact, the President has provided that charges can properly be withdrawn from a court-martial when it is proposed to use an accused "as a witness." Manual for Courts-Martial, supra, paragraph 56a.[5] We have already seen that withdrawal of charges after the presentation of some evidence results in the attachment of jeopardy, and confers immunity from later prosecution; in consequence, the accused cannot, when called as a witness, invoke the privilege against self-incrimination. Must immunity for a prospective witness be conditioned upon whether a particular point is reached in the court-martial process? We can infer no such limitation from the manner in which the power to grant immunity was spelled out by Congress in the Uniform Code.

We are unwilling to attribute to Congress a preference for form over substance, especially in a field in which it has consistently recognized the imperatives of direct action, and the necessity for economy of personnel and effort. The military criminal practice parallels, but does not duplicate, that in the civilian community. Courts-martial processes are designed to cope with the urgencies of war, as well as the conveniences of peace. This does not mean that any substantial right of a person subject to the Uniform Code can be diluted or denied because of military expediency. But, it does mean that when Congress confers broad power to accomplish a specified purpose, there is an allowable discretion to formulate different methods by which to exercise the power. See Logansport Broadcasting Corp. v United States, 210 F2d 24 (CA DC Cir) (1954). In fact, from the legislative background of the Uniform Code, it may be inferred that Congress was aware of, and approved, the precise

[5] There is no indication in this provision of the Manual that the withdrawal of the charge comes only after the presentation of some evidence.

method used in this case to effectuate the powers it granted. The old Articles of War required the President to place before Congress all rules and regulations prescribing the procedures for courts-martial. Article of War 38, 10 USC (1946 ed, Supp IV) § 1509 (now Article 36, Uniform Code of Military Justice, 10 USC § 836). Over the years between the original grant of authority in 1916 and the Uniform Code, the President provided various manuals for courts-martial. All contain some provisions on the subject; and since 1928 these provisions have been essentially the same as those in the current Manual. All the previous manuals were known to Congress when it considered the Uniform Code. Also, it is probable that the standing committees on military affairs in both Houses of Congress were aware of legal opinion in the Army to the effect that a grant of immunity to a witness had the "sanction of law"; and that such grants were used in practice. Dig Ops, 1912–40, § 395 (57); United States v Smith, 76 BR 71. Yet, in the long and detailed hearings on the Code, no voice was raised against the interpretation of the law, or the practice, on grants of immunity to prospective witnesses who might otherwise invoke the privilege against self-incrimination. Long-continued legislative acquiescence in known procedure can properly be read into reenactment of the underlying statutes. United States v Butts, 7 USCMA 472, 475, 22 CMR 262.

We come now to the accused's contention that the Manual does not purport to establish a method by which a grant of immunity can be effected, but merely comments on the legal consequences of immunity achieved in other ways. In several cases before this Court, which involved some of the legal effects of a grant, we proceeded on the assumption that this form of immunity was founded upon the Manual's provisions. See United States v Gilliland, supra; United States v Thompson, 11 USCMA 252, 255, 29 CMR 68; United States v White, 10 USCMA 63, 27 CMR 137. From what we have said ▮▮▮▮▮ as to the source of the power to grant immunity, it is apparent the Manual did not create it; Congress did. But the Manual can, and does, undertake to regulate the form of its exercise before guilt is determined by a court-martial. It can do so because the matter is one within the competency of the President under Article 36 of the Code.

Recently, the Supreme Court of the United States reaffirmed that the constitutional privilege against self-incrimination is something more than "a mere rule of evidence." Malloy v Hogan, 378 US 1, 9, 12 L ed 2d 653, 84 S Ct 1489 (1964). Cf. United States v Moore, 14 USCMA 635, 34 CMR 415. While the distinction between substantive and procedural law has become increasingly blurred, the manner in which the privilege can be asserted and effectuated falls within the latter class. All the pertinent Manual state- ▮▮▮▮▮ ments on immunity are keyed to the provision in paragraph 150b, to the effect that a witness has no right to assert the privilege of the Fifth Amendment when he has a grant of immunity from a competent general court-martial authority. A grant of immunity makes it unnecessary to institute proceedings against the witness to the point where it would become apparent, under the exact language of the Code, that the witness has acquired immunity from further prosecution. Implicit in the accused's own brief is acknowledgment that when a material witness invokes the privilege against self-incrimination, the President can direct that immediate steps be taken to effect his immunity by referring appropriate charges to trial, and withdrawing them as soon as some evidence is introduced.[6] In our opinion, the President has channeled the power

---

[6] We are mindful of the provision in Article 34(a) of the Uniform Code, 10 USC § 834, that a convening authority "may not refer a charge to a general court-martial for trial unless he has found that the charge . . . is war- ranted by evidence." Although limited to a general court-martial, we assume the "spirit" of the Article weighs against the reference of an unsupported charge to trial by either a special or summary court-martial. The purpose

to grant immunity from prosecution, which was conferred by Congress upon courts-martial authority, into a direct and efficient course of action to obviate the basis for a claim of testimonial privilege. The accused does not dispute General Taylor's status as a competent general court-martial authority, and the record of trial indicates this requirement of the Manual provision was satisfied.

The determination that General Taylor had power to grant immunity, and that his power was exercised in the form and for a purpose authorized by the President, still leaves open for consideration two other issues. The first is concerned with whether the grant of immunity was effective by its own terms to eliminate the accused's right to assert the privilege against self-incrimination, or whether the accused had the right to reject the grant and insist upon the privilege. The Supreme Court of the United States has described the Presidential grant of immunity to a prospective witness as "a deed" which confers a "property" right upon the witness; and, as a "deed," it must be accepted before it can become operative. Burdick v United States, 236 US 79, 59 L ed 476, 35 S Ct 267 (1915); United States v Wilson, 7 Peters 150 (U.S. 1833). In the *Burdick* case the Court distinguished the grant of immunity to a prospective witness by the President from one prescribed in a statute by Congress. Whether the distinction can survive reexamination in the light of more recent cases need not detain us. We are not dealing with a grant of immunity by the President alone; we are dealing with a statute enacted by Congress. Congress conferred upon the courts-martial authority the power to exonerate a person subject to the Uniform Code from the penalties for any offense in violation thereof. The President's role is no more than designation of appropriate means by which to exercise the power. The power is, therefore, statutory, not executive, in origin; and it is endowed with the qualities of a direct grant of immunity by Congress. A grant of immunity by Congress requires no acceptance to be effective; it cannot be rejected by the witness without subjecting himself to the charge of willful refusal to testify. Brown v Walker, supra; Ullmann v United States, supra.

Appellate defense counsel's last contention is that General Taylor's grant of immunity will not protect the accused from prosecution in a Federal district court. Briefly, the argument is to the effect that accused's answers might form a link in a chain of evidence to connect him with the offense of conspiracy to obtain and deliver to a foreign agent instruments connected with the national defense, in violation of 18 USC § 793. That offense is not a capital offense, and is, consequently, subject to court-martial jurisdiction, under Article 134 of the Uniform Code. However, 18 USC § 3486 confers upon a United States attorney the power, with the approval of the Attorney General, to apply, in a case under Section 793 and other enumerated statutes, to a "court of the United States" for an order directing a prospective witness to testify; the witness

---

of the provision is to protect an accused against the harassment and stresses of a trial on unfounded charges. See United States v Schuller, 5 USCMA 101, 17 CMR 101. It, however, may be questioned whether this laudable purpose prohibits reference of suspected charges to trial on somewhat lesser evidence, when the objective is to free the accused from prosecution thereafter so that he might be able to testify without incriminating himself. There are other circumstances that tend to a conclusion that nothing in Article 34 stands in the way of the use of a grant of immunity as a permissible substitute for formal reference of specific charges to trial. In any event, all of the original charges against the accused were actually referred to a general court-martial for trial, and it is reasonably inferable that such action was taken on the affirmative recommendation of the staff judge advocate that the available evidence justified trial on the charges. Thus, if Article 34 constitutes a limitation on the extent to which a grant of immunity can substitute for actual referral of charges to trial, the limitation is inapplicable here.

may not then assert the privilege against self-incrimination, but he cannot be prosecuted for offenses to which his testimony may be linked. In view of this statute, say appellate defense counsel, no others can grant immunity to a witness in a case involving the national security. See Botany Worsted Mills v United States, 278 US 282, 73 L ed 379, 49 S Ct 129 (1929). The legislative history of 18 USC § 3486 indicates that the provision regarding a "court of the United States" is intended to apply to the Federal district courts. See 2 United States Code Congressional and Administrative News Service 3065 (1954). The provision relates to grand jury proceedings, which are not applicable to the military judicial system, and constitutes a grant of power to the United States attorney, a Government officer having only the most incidental connection with the military criminal law. See Article 47, Uniform Code of Military Justice, 10 USC § 847. We perceive nothing in the language of Section 3486 to diminish the immunity power of the military commander under the Uniform Code, and the authority of the President under Article 36. United States v Baker, 14 USCMA 311, 34 CMR 91. Also, nothing in the Section purports to affect the provisions of Article 76 of the Uniform Code, 10 USC § 876, which *inter alia* direct, that "the proceedings of courts-martial and all action taken pursuant to those proceedings are binding upon all . . . courts, agencies, and officers of the United States." Section 3486 merely provides a means to obtain the testimony of a witness before a Federal grand jury or district court. It does not override or lessen the powers of commanders under the Uniform Code or affect the processes of courts-martial.

One last question remains: Is the grant of immunity by General Taylor sufficiently broad to protect the accused against any prosecution that might result from his testimony? Earlier in our opinion we noted the accused had originally been charged with conspiracy to obtain and deliver instruments connected with the national defense, in violation of 18 USC § 793. The provisions of Section 793 closely correspond to those of Section 794, but the penalty is different. Section 793 carries a maximum punishment extending only to imprisonment for a term of ten years, but Section 794 authorizes the death penalty. A court-martial has no jurisdiction over an offense defined in the general Federal penal code, which authorizes the death sentence. Article 134, Code, supra; United States v French, 10 USCMA 171, 27 CMR 245. If the offense is not cognizable by a court-martial, manifestly a general court-martial authority cannot grant immunity from prosecution therefor. We may assume for purposes of this appeal that as to delivery of an instrument relating to the national defense there are sufficient differences between the two Sections to justify the conclusion that a legal bar to prosecution under Section 793 would not prevent prosecution under Section 794, although there may be a question of *res judicata* as to particular facts. Cf. United States v Coplon, 88 F Supp 910, 911 (SD NY) (1949); United States v Soblen, 301 F2d 236, 240 (CA 2d Cir) (1962). The assumption does not aid the accused.

The record of trial indicates that the only items which might possibly be involved in transactions affecting the accused were a publication titled "The Soldier's Guide," a field manual, a M-14 rifle, a M-60 machine gun, a XM-79 grenade launcher, and a gas mask. The Soldier's Guide is an unclassified booklet published by the Government Printing Office and is readily available to the public for $1.00. FM 21-13, August 22, 1961. The field manual is not specifically described, but it is reasonably inferable that it also is an unclassified document available to the general public. Written materials of this kind are not, as Judge Learned Hand of the Court of Appeals for the Second Circuit pointed out, within the purview of the act:

". . . As declared in Gorin v United States, 312 US 19, 28, 61 S Ct 429, 85 L Ed 488, and as the judge himself charged, it is obviously law-

ful to transmit any information about weapons and munitions of war which the services had themselves made public; and if that be true, we can see no warrant for making a distinction between such information, and information which the services have never thought it necessary to withhold at all. There can, for example, be no rational difference between information about a factory which is turning out bombers, and to which the army allows access to all comers, and information about the same bombers, contained in an official report, or procured by a magazine through interviews with officers. The services must be trusted to determine what information may be broadcast without prejudice to the "national defense," and their consent to its dissemination is as much evidenced by what they do not seek to suppress, as by what they utter. Certainly it cannot be unlawful to spread such information within the United States; and, if so, it would be to the last degree fatuous to forbid its transmission to the citizens of a friendly foreign power. 'Information relating to the national defense,' whatever else it means, cannot therefore include that kind of information, and so far as Heine's reports contained it, they were not within the section." [United States v Heine, 151 F2d 813, 816 (1945), cert den 328 US 833, 90 L ed 1608, 66 S Ct 975 (1946).]

The rifle, machine gun, grenade launcher, and gas mask appear to be instruments connected with the national defense, but they have been described in unrestricted publications issued by the military, and are also available to the public. See TM 9–1005–223–34, April 8, 1963; TM 9–1005–224–12, October 29, 1963; TC 9–1010–205–12, February 3, 1961; TM 3–4240–231–12, June 28, 1962. Whether ready availability of information as to operation and maintenance of these articles of military equipment is sufficient to take them out of the operation of the statute need not concern us. There is no evidence in the record, and at no time has the defense ever contended, that the ac-

cused's testimony at Roumanis' trial might, in any way, have led to a charge under Section 794.

In the circumstances disclosed by the record of trial before us, it is not at all "evident from the implications of the question[s], in the setting in which . . . [they were] asked, that . . . responsive answer[s] . . . or an explanation of why . . . [they could not] be answered might be dangerous because injurious disclosure could result" in a prosecution under Section 794. Hoffman v United States, 341 US 479, 486–487, 95 L ed 118, 71 S Ct 814 (1951); see also Mason v United States, 244 US 362, 61 L ed 1198, 37 S Ct 621 (1917). General Taylor's grant of immunity was, therefore, coextensive with the accused's privilege against self-incrimination, and fully protected him against any prosecution for offenses to which his testimony as a witness at Roumanis' trial might possibly have linked him. See Murphy v Waterfront Commission of New York Harbor, 378 US 52, 12 L ed 2d 678, 84 S Ct 1594 (1964).

The decision of the board of review is affirmed.

KILDAY, Judge (concurring):

I concur.

I concur in the opinion by Chief Judge Quinn. However, I desire to set forth the following additional views.

Together with the considerations mentioned by the Chief Judge, it is, I believe, necessary to take into account the very substantial impact, upon the question of immunity, of Murphy v Waterfront Commission of New York Harbor, 378 US 52, 12 L ed 2d 678, 84 S Ct 1594, and Malloy v Hogan, 378 US 1, 12 L ed 2d 653, 84 S Ct 1489, both decided June 15, 1964. The first cited case contains a complete review of the legal history of the question of immunity and very materially alters some of the views previously expressed by the Supreme Court.

The protection of the Fifth Amendment is that no person "shall be compelled in any criminal case to be a witness against himself." In a valid exercise of the power granted him by

**97**

Article 36, Uniform Code of Military Justice, 10 USC § 836, the President has effectively proscribed the use against an accused, in a trial by court-martial, of any statement made by him as a result of "promises of immunity . . . with respect to an offense allegedly committed by the accused." Paragraphs 68*h*, 140*a*, 148*e*, 150*b*, Manual for Courts-Martial, United States, 1951. These provisions have the force of law. United States v Smith, 13 USCMA 105, 32 CMR 105.

A grant of immunity is valid only if it is coextensive with the scope of the privilege against self-incrimination. Counselman v Hitchcock, 142 US 547, 35 L ed 1110, 12 S Ct 195; Murphy v Waterfront Commission of New York Harbor, supra, 378 US at page 54. The following significant language appears in the last-mentioned case at 378 US 55:

"The privilege against self-incrimination 'registers an important advance in the development of our liberty—"one of the great landmarks in man's struggle to make himself civilized." ' Ullman v United States, 350 US 422, 426, 76 S Ct 497, 500, 100 L ed 511. It reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates 'a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and. by requiring the government in its contest with the individual to shoulder the entire load,' 8 Wigmore, Evidence (McNaughton rev., 1961), 317; our respect for the inviolability of the human personality and of the right to each individual 'to a private enclave where he may lead a private life,' United States v Grunewald, 233 F 2d 556, 581–582 (Frank, J., dissenting), rev'd 353 US 391, 77 S Ct 963, 1 L ed 2d 931; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a shelter to the guilty,' is often 'a protection to the innocent.' Quinn v United States, 349 US 155, 162, 75 S Ct 668, 673, 99 L ed 964."

The following additional language in *Murphy,* supra, will serve to illustrate the very considerable impact of that case upon our former notions of immunity against self-incrimination. At 378 US, page 77, we read:

"The foregoing makes it clear that there is no continuing legal vitality to, or historical justification for, the rule that one jurisdiction within our federal structure may compel a witness to give testimony which could be used to convict him of a crime in another jurisdiction."

At pages 77–79 of the same volume appears the following:

". . . We hold that the constitutional privilege against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law.

. . . . .

". . . we hold the constitutional rule to be that a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him. We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of compelled testimony and its fruits. This exclusionary rule, while permitting the States to secure information necessary for effective law enforcement, leaves the witness and the Federal Government in substantially the same position as if the witness had claimed

his privilege in the absence of a state grant of immunity."

In my view, many of the cases cited in the dissenting opinion by Judge Ferguson, if not overruled, have been seriously emasculated by Malloy v Hogan and Murphy v Waterfront Commission of New York Harbor, supra.

Under *Murphy*, supra, a grant of immunity by one sovereignty is effective in the courts of the other sovereignty. In the case before us the question can relate only to two courts within the Federal Government. The alleged offense was committed in Germany and no court of any state could hold jurisdiction over it. If immunity granted by the court of a state could protect against incrimination before a Federal court, or vice versa, it seems abundantly clear such is true between two courts created by Federal law. It becomes evident there was no real danger to the accused of prosecution in any other court. Therefore, I join in affirming the decision of the board of review.

FERGUSON, Judge (dissenting):

I dissent.

For many years, this Court has decided issues on the periphery of the question whether an officer exercising general court-martial jurisdiction has the authority to compel an individual to testify to self-incriminatory matters by granting him immunity from prosecution for the offenses he—contrary to the terms of the Fifth Amendment, United States Constitution, and Uniform Code of Military Justice, Article 31, 10 USC § 831—would thus be required to reveal. See, for example, United States v Werthman, 5 USCMA 440, 18 CMR 64; United States v White, 10 USCMA 63, 27 CMR 137; United States v Moffett, 10 USCMA 169, 27 CMR 243; United States v Borsella, 11 USCMA 80, 28 CMR 304; and United States v Thompson, 11 USCMA 252, 29 CMR 68. In none of these cases, however, was the accused tried for refusal to testify to self-incriminatory matter after purportedly being granted immunity by a competent authority, and we were not called upon to decide whether the power

absolutely to preclude one's trial for criminal offenses in return for cooperation with the prosecution exists in the armed forces. That is the question now directly before us, and I am of the view that it must be answered in the negative. I wholly disagree with the view of the principal opinion that such authority may be derived from the power to pardon or implied from the various provisions of the Code which it cites. I believe, lacking specific authority from the Congress, there can be no effective method to require an individual to forego his undoubted right to rely upon his Constitutional and codal protections.

The accused here was found guilty, in violation of Code, supra, Article 134, 10 USC § 934, of a specification alleging, in part, that he:

"... [H]aving received a grant of immunity from Major General B. F. Taylor, an officer exercising General Court-Martial jurisdiction, and being in the presence of a General Court-Martial of the United States ... did ... wrongfully refuse to answer ... [certain enumerated questions when directed by the law officer to do so] by replying to each question as follows: 'On the advice of my counsel I firmly stand on the Fifth Amendment to the Constitution of the United States of America and Article 31,' or words to that effect."

As the Chief Judge notes, accused, having been duly arraigned upon this count, contested its validity before the law officer on the ground that no officer exercising general court-martial jurisdiction had the authority to grant absolute immunity from prosecution to a military accused and that, in any event, such grant would not forbid the accused's trial—based upon his revelations upon the stand in response to such grant—in a United States district court. In this respect, it is worthy of comment that the disclosures which the grant would have required accused to make would have subjected him ordinarily to trial in either Federal jurisdiction for violations of the Espionage Act. See, generally, 18 USC § 793,

**99**

and United States v French, 10 USCMA 171, 27 CMR 245.

The parties having agreed upon the facts, and it appearing to the law officer the officer exercising general court-martial jurisdiction had purported to grant immunity from prosecution to the accused "for any offense concerning which you may testify in the case of the *United States v Private First Class John D. Roumanis* for which you have not been tried as of the date trial commences in the above entitled case," the defense motion to dismiss was overruled. Thereafter, pursuant to a pretrial agreement with the convening authority, whereby no sentence in excess of a suspended punitive discharge was to be approved, the accused pleaded guilty and persisted in that plea throughout the trial.

The problem of granting immunity to suspects and securing their testimony against other defendants has perplexed judicial authorities for years. Normally, perhaps, cooperation of such persons and their appearance against criminal companions is secured by the device of entering writs of *nolle prosequi* as to the indictments of the proposed witnesses, interceding with the courts on their behalf in order to obtain more lenient punishment in view of their assistance to the Government or permitting them to enter pleas of guilty to lesser degrees of crime. But all such devices succeed only if the potential witness is willing to accept such a deal and testify voluntarily. In order to force the discard of his constitutional right not to incriminate himself and compel him to testify, he must be given an absolute grant of immunity which will serve to preclude his future prosecution for the criminal matters which he is required judicially to confess. Annotation, 100 L ed 533, at page 538. Such was noted in Counselman v Hitchcock, 142 US 547, 35 L ed 1110, 12 S Ct 195 (1892), at page 585:

"We are clearly of the opinion that no statute which leaves the party or witness subject to prosecution after he answers the criminating questions put to him, can have the effect of supplanting the privilege conferred by the Constitution of the United States. . . . In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates."

See also Brown v Walker, 161 US 591, 40 L ed 819, 16 S Ct 644 (1896), and Ullmann v United States, 350 US 422, 100 L ed 511, 76 S Ct 497 (1956).

Thus, mere inability to use the evidence against an accused in a subsequent criminal proceeding or a promised *nolle prosequi* of charges against him is insufficient to require him to forego his constitutional privilege. Counselman v Hitchcock, supra; United States v Bryan, 339 US 323, 94 L ed 884, 70 S Ct 724 (1950); State v Quarles, 13 Ark 307; Cullen v Commonwealth, 24 Grat (Va) 624 (1873); Temple v Commonwealth, 75 Va 892 (1881). In order to support the charge alleged here, therefore, it is necessary to find that an officer exercising general court-martial jurisdiction is authorized to grant to a military accused "absolute immunity against future prosecution for the offense to which the question relates." Counselman v Hitchcock, supra, at page 585; Ullmann v United States, supra. The United States, however, relies only upon the fact that the Manual for Courts-Martial, United States, 1951, provides, in several instances, for application of the doctrine, and argues that the basis therefor may be found in Code, supra, Article 30, 10 USC § 830, which provides pertinently:

"Upon the preferring of charges, the proper authority shall take immediate steps to determine *what disposition should be made thereof in the interest of justice and discipline,* . . ." [Emphasis supplied.]

It is clear that the contention regarding the Manual, supra, is untenable. First, the President is delegated, with regard to that volume, no further authority than to prescribe rules of procedure and modes of proof, neither of which categories is involved here. Code, supra, Article 36, 10 USC § 836; United States v Smith, 13 USCMA 105,

32 CMR 105. As Judge Kilday declared for the Court, in the last-mentioned case, at pages 117–118:

"... [T]he Constitution vests in Congress the power to make rules for the government and regulation of the armed forces, ... [and]

• • • • • •

"... Congress may delegate to the President, ... the power to make regulations *to fill up details and implement statutory provisions, or to determine the details of the legislative scheme.*" [Emphasis supplied.]

That is the scope of the Presidential authority with respect to the Manual, supra, and we there specifically rejected the concept that there existed in the Executive, separate and apart from the Uniform Code, supra, power to prescribe matters of substantive law such as that presently before us. United States v Smith, supra. Moreover, there is clear authority rejecting the concept that authority exists independently of the Congress to grant binding immunity to a proposed Government witness so that his constitutional privilege will avail him nothing.

In United States v Ford, 99 US 594, 25 L ed 399 (1879), defendants pleaded in bar of their conviction an arrangement with the United States District Attorney whereby, in return for their appearance on behalf of the Government, they were to be discharged from criminal and civil liability. The Supreme Court held that such promises could not, in absence of positive statutory authority, bind the United States not to prosecute the defendants. At most, they were entitled to a continuance of the trial for the purpose of obtaining a pardon from the President in return for their cooperation. Thus, Mr. Justice Clifford declared, at page 595:

"*Where the case is not within any statute,* the general rule is that if an accomplice, when examined as a witness by the public prosecutor, discloses fully and fairly the guilt of himself and his associates, he will not be prosecuted for the offense disclosed; *but it is equally clear that he cannot by law plead such facts in bar of any indictment against him, nor avail himself of it upon his trial, for it is merely an equitable title to the mercy of the Executive, subject to the conditions before stated, and can only come before the court by way of application to put off the trial in order to give the prisoner time to apply to the Executive for that purpose.*" [Emphasis supplied.]

In Burdick v United States, 236 US 79, 59 L ed 476, 35 S Ct 267 (1915), it was sought to compel the petitioner's testimony by having the President grant him a pardon as to any offense concerning which he might incriminate himself in his testimony before a Federal grand jury. The petitioner, refusing to testify, argued that tender of such a pardon could not operate to deprive him of his right not to incriminate himself under the Constitution, if such were not accepted by him. Holding that a pardon must be accepted to be effective and finding that the petitioner had rejected the tender, the Court pointed out that it was not such an act as would remove the right not to incriminate onself. It declared, at page 94:

"This brings us to the differences between legislative immunity and a pardon. They are substantial. The latter carries an imputation of guilt; acceptance a confession of it. The former has no such imputation or confession. It is tantamount to the silence of the witness. It is noncommittal. It is the unobtrusive act of the law given protection against a sinister use of his testimony, not like a pardon, requiring him to confess his guilt in order to avoid a conviction of it."

And in United States v Shotwell Manufacturing Company, 225 F2d 394 (CA7th Cir) (1955), *reversed on other grounds,* 355 US 233, 2 L ed 2d 234, 78 S Ct 245 (1957), the Circuit Court of Appeals rejected the contention that "defendants had acquired immunity from criminal prosecution by making a 'voluntary disclosure', in reliance upon an announced policy of the Treasury Department not to prosecute in

[tax] cases where such a disclosure had been made." Circuit Judge Schnackenberg declared at page 397:

*"There was no statutory basis for the alleged promises of immunity announced by the various Treasury Department officials. Thus the making of a voluntary disclosure by the defendants was no legal bar to a criminal prosecution. Only an act of Congress could create such immunity. In the absence of statute, a defendant cannot enforce such a promise and 'cannot by law plead such facts in bar of any indictment against him, nor avail himself of it upon his trial. . . .' In re Whiskey Cases, 99 US 594, 25 L Ed 399, 400."* [Emphasis supplied.]

From these holdings of the Supreme Court and other Federal courts, it is patent that the Executive Branch of the Government does not possess any authority, either under the pardoning power or otherwise, to grant immunity from prosecution for a violation of a criminal statute. Only an act of Congress can create such immunity. United States v Shotwell Manufacturing Company, supra. Similarly, the judiciary does not possess such power to treat an individual's crimes so that he escapes their punitive consequences. Sorrells v United States, 287 US 435, 77 L ed 413, 53 S Ct 210 (1932). There, Mr. Chief Justice Hughes declared, at page 449:

"We are unable to approve the view that the court, although treating the statute as applicable . . . and the defendant as guilty, has authority to grant immunity, or to adopt a procedure to that end."

See also Ex parte United States, 242 US 27, 61 L ed 129, 37 S Ct 72 (1916).

Nor has the military traditionally claimed the authority to grant the immunity necessary to require an individual to forego his right not to incriminate himself. Winthrop's monumental work treats accused's cooperation with the Government only as one "of the principal grounds upon which the discretion to 'pardon or mitigate' has been, in practice, exercised." Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 474. He

further notes that where "the witness has testified in good faith on the trial" either a *nolle prosequi* is entered as to the charges against him or "it is in general announced in the Order in which the proceedings in the case are passed upon that he is released from arrest, and further proceedings against him are discontinued." *Id.,* at page 336. It has also been noted that the early military practice was to have "the court . . . in its discretion, upon the application of the prosecutor, order . . . [accomplice-witnesses] to be acquitted, for the purpose of giving evidence against the rest" and then adjourn to have such acquittal confirmed by the convening authority. Dehart, Observations on Military Law, and the Constitution and Practice of Courts-Martial, page 395 (1846); Grimm, Grants or Promises of Immunity Under Military Law, page 61 (Thesis, The Judge Advocate General's School, United States Army, Charlottesville, Virginia, April 1957). Another authority pointed out that such witnesses were permitted to appear for the Government under an implied promise of pardon and, if they acted in good faith, the United States was honorably bound to discharge its obligation to them. Benét, A Treatise on Military Law and the Practice of Courts-Martial, 6th ed, page 300 (1868). See also Simmons, Remarks on the Constitution and Practice of Courts-Martial, 5th ed, page 360 (1863).

Thus, the early military practice was precisely that approved for use in the Federal courts in United States v Ford, supra, *i.e.,* that the cooperation of the witness entitled him to no more than an "equitable claim to a pardon . . . limited to the particular offence, for the prosecution of which his testimony is admitted." Benét, supra, at page 300. Indeed, the applicable principle was recognized in A Manual for Courts-Martial, U. S. Army, 1917:

". . . As in the following cases the witness would not be liable to the law's punishment, his privilege as to self-incrimination ceases:

"Conviction and the suffering of the punishment; acquittal, or other

former jeopardy; abolition of the general crime, subsequent to its commission (provided the rule of criminal law thereby exonerates prior offenders); lapse of time barring prosecution of the particular offense; executive pardon [accepted, see Burdick v United States, supra] for the particular offense; *statutory amnesty, before or after the act, for the particular criminal act or for the offender.* (Wigmore, p 3163.)" [Emphasis supplied.] [Manual, 1917, supra, paragraph 233, page 116.]

Elsewhere, the same volume refers to the fact that an accomplice is not rendered immune from trial by reason of turning state's evidence, "unless immunity has been promised him by the authority competent to order his trial" and points out that, if he "makes a full and frank statement of the circumstances of the offense, it is customary to pardon his offense, or impose upon him a milder punishment than upon his accomplices." Manual, 1917, supra, paragraph 216.

Similarly, the Manual for Courts-Martial, U. S. Army, 1921, lists one of the grounds for *nolle prosequi* of charges as being "That it is proposed to use one of the accused as a witness." Manual, 1921, supra, paragraph 158. But, again, it refers only to removal of the privilege against self-incrimination by "*statutory* amnesty, before or after the act, for the particular criminal act or for the offender." (Emphasis supplied.) Manual, 1921, supra, paragraph 233, at page 195. It repeats the injunction that appearing for the prosecution does not render an accomplice immune from trial, except insofar as he has been promised immunity by competent authority. Manual, 1921, supra, paragraph 216. And the Manual for Courts-Martial, U. S. Army, 1928, similarly points out that if a witness is "not on trial himself he may assert his privilege not to incriminate himself," and the fact that he does so testify does not "make him afterwards immune from trial except to the extent that immunity may have been promised him by an authority competent to order his trial by general court-martial."

Manual, 1928, supra, paragraph 120, at page 125. Indeed, the Manual for Courts-Martial, U. S. Army, 1949, also speaks in terms of promised immunity and makes no reference to its impingement upon a witness' right to claim his constitutional protection. Manual, supra, 1949, paragraphs 134, 136, pages 175–176, 180–181. Thus, it was not until the Uniform Code of Military Justice was passed and the 1951 Manual for Courts-Martial promulgated, that references are found in military law to grants of immunity by a general court-martial convening authority as abridging the constitutional right of a witness not to incriminate himself and requiring him to testify, "by military orders carrying the awesome sanctions of the 90th Article, supra, or otherwise to furnish a necessary evidential fact." United States v Rosato, 3 USCMA 143, 147, 11 CMR 143, 147. Here, for the first time, the Executive claimed the right to force a witness to testify by promising not to try him. From the foregoing, therefore, it may safely be gathered that military law has not heretofore considered the cooperation of an accused or accomplice witness in return for a promise of immunity to be required or, indeed, to entitle him to more than an engagement on the part of the convening authority not to prosecute him or, in the event of such prosecution, to an equitable expectation of pardon by the Executive. See also Naval Courts and Boards, 1937, section 236. Such is not the sort of immunity which a defendant may properly plead in bar of trial. "In the absence of statute, a defendant cannot enforce such a promise and 'cannot by law plead such facts in bar of any indictment against him, nor avail himself of it upon his trial, . . .'" United States v Shotwell Manufacturing Company, supra, at page 397. As it does not shield the accused from prosecution, it cannot make him subject to punishment for reliance upon his privilege and cannot make legal any military order to compel him to answer. United States v Ford, supra; Ullmann v United States, supra; Counselman v Hitchcock, supra; Brown v United States, 359 US 41, 3 L ed 2d 609, 79

S Ct 539 (1959); Annotations, 100 L ed 533, 5 L ed 2d 950.

I do not understand my brothers, except for their untenable interpretation of past Manual provisions, necessarily to disagree with the foregoing concepts, for the principal opinion puts to one side the question of Presidential authority and "perceive[s] a Congressional grant of power to provide immunity from prosecution in the provisions of the Uniform Code." Aside from resting upon the erroneous premise that earlier Manuals followed this practice, and Congress, knowing this, must have approved of it, it relies, in this respect, upon the following Articles:

**"Art. 30. Charges and Specifications**

. . . . . .

"(b) Upon the preferring of charges, the proper authority shall take immediate steps to determine what disposition should be made thereof in the interest of justice and discipline, and the person accused shall be informed of the charges against him as soon as practicable." [10 USC § 830.]

**"Art. 44. Former Jeopardy**

"(a) No person may, without his consent, be tried a second time for the same offense.

. . . . . .

"(c) A proceeding which, after the introduction of evidence but before a finding, is dismissed or terminated by the convening authority or on motion of the prosecution for failure of available evidence or witnesses without any fault of the accused is a trial in the sense of this article." [10 USC § 844.]

**"Art. 64. Approval by the convening authority**

"In acting on the findings and sentence of a court-martial, the convening authority may approve only such findings of guilty, and the sentence or such part or amount of the sentence, as he finds correct in law and fact and as he in his discretion determines should be approved." [10 USC § 864.]

Combined, my brothers say, these provisions of the Uniform Code "confer upon courts-martial authority the power to create an absolute legal bar to prosecution of a person subject to the Code and to his command for any offense in violation of the Code" and, in consequence, "comprehend the right to grant immunity from prosecution to a witness to free him from the danger that he may be punished for an offense to which he might be linked by his testimony." His authority, they say, "equates to the power to pardon."

At the outset, of course, a basic flaw in their rationale is apparent, for granting the equation between the powers of a convening authority and the constitutional prerogative of the President to pardon an offender against the laws of the United States, such pardon has been twice held by the Supreme Court to be ineffective to require an accused to testify despite his right not to incriminate himself. Burdick v United States, supra; Curtin v United States, 236 US 96, 59 L ed 482, 35 S Ct 271 (1915). Thus, if the convening authority's powers regarding courts-martial be construed as the right to pardon, still the defendant has the right to choose his course of action, *i.e.*, either to rely on the purported grant of immunity and testify, or to rely upon his constitutional privilege and remain silent in face of military orders to the contrary. Cf. United States v Rosato, supra. And that is precisely the choice which Kirsch exercised here. Be that as it may, the statutes in question may not be construed to grant a convening authority the right to suspend the execution of the criminal laws, either military or civilian, and Congress did not intend any such result to occur.

First, as noted above, it is clear from the holdings of the Supreme Court that grants of immunity coextensive with removal of the protection of the constitutional privilege must be found in positive enactments of the Congress. United States v Ford, supra; Burdick v United States, supra; United States v Shotwell Manufacturing Company, supra. Indeed, as stated in United States v Levy, 153 F2d 995 (CA 3d Cir) (1946), only

**104**

the equitable right to pardon "exists *unless a statute expressly authorizes a grant of immunity* in the particular situation." (Emphasis supplied.) *Id.*, at page 997. See also Mattes v United States, 79 F2d 127 (CA 3d Cir) (1935). That there is no express provision in the Code or elsewhere granting such authority to military commanders is unarguable.

Secondly, the construction of the aforementioned Articles to grant such authority through implication is strained and unreal. Aside from the general "unwillingness of Congress to permit . . . the acquisition of immunity," Sherwin v United States, 297 Fed 704, 709 (CA 5th Cir) (1924), no such intention on its part is manifest either in the wording or fair implication of the portions of the Act relied upon. Thus, Code, supra, Article 30, while providing for the taking of immediate steps to dispose of charges against an accused "in the interest of justice and discipline," does no more than to direct the commander concerned rapidly to determine, *"Upon the preferring of charges"* (emphasis supplied), in court-martial cases, whether they are properly supported by the accusatorial investigation and to provide his recommendation as to their disposition or reference to trial. He is, in the same sentence, enjoined to have the accused "informed of the charges against him as soon as practicable" and, by no stretch of the imagination, can I conceive these general directions to review a file and to inform the accused of the nature of the formal accusation against him as granting any authority to immunize him from further prosecution. In fact, we have held if such scrutiny results in a determination either not to prefer charges or to dismiss them, no bar to their later revival and prosecution may be interposed. United States v Werthman; United States v Thompson, both supra. Compare United States v Ford, supra. The Article, in fact, as the title of the subchapter in which it is found indicates, refers to the ordinary pretrial procedure regarding the preliminary disposition of charges and specifications in order to screen out unwarranted ac-

cusations and to handle counts at the lowest possible level consistent with the just enforcement of military discipline. Manual, 1951, supra, paragraphs 32, 33. It has never been interpreted otherwise. See United States v Werthman and United States v Thompson, both supra. In sum, all that the Article was intended to provide was the requirement of "disposition of the charges as soon as possible and . . . notification of the accused." House Report No. 491, 81st Congress, 1st Session, page 19.

I find the argument concerning the possible effect of Code, supra, Article 44, equally fallacious. This portion of the Code is limited to enactment of the constitutional provision regarding double jeopardy, in light of its interpretation by the Supreme Court. Wade v Hunter, 336 US 684, 93 L ed 974, 69 S Ct 834 (1949). It prescribes the conditions under which jeopardy is held to attach and, undoubtedly, where the accused is so protected against future punishment for his crime, he could be compelled to testify without regard to his Fifth Amendment rights. Annotation, 100 L ed 533, supra. But there is not the slightest indication that Congress intended such protection to be afforded him by the convening authority without resort to the conditions prescribed in the statute. To the contrary, it provides that an accused is *not protected against retrial* unless he "has been found guilty" and "the finding of guilty has become final after review of the case has been fully completed" or his trial has been terminated "after the introduction of evidence but before a finding . . . by the convening authority or on motion of the prosecution." Such provisions are no more than a reiteration of his commonly understood right not to be twice punished for the same crime and, if as here, he has never been arraigned or tried, it hardly may serve as a foundation for the implication that —quite without resort to trial—an officer exercising general court-martial jurisdiction may, by simple *fiat*, shield him from further danger of prosecution. In short, Congress intended nothing further here than a codification of the rule of double jeopardy for the military,

**105**

and there is nothing to support the proposition that it thereby intended to grant *carte blanche* authority to commanders to immunize one from criminal prosecution, particularly where it has denied such power to the ordinary Federal authorities except in a few limited areas and then only when the consent of the Attorney General, a cabinet officer, is obtained. House Report, supra, page 23; Reina v United States, 364 US 507, 5 L ed 2d 249, 81 S Ct 260 (1960).

The final, crumbling mortar with which the principal opinion attempts to cement its conclusion is Code, supra, Article 64, entitled. "Approval by the convening authority," and dealing exclusively with that officer's action "on the findings and sentence *of a court-martial.*" (Emphasis supplied.) Undoubtedly, his authority to disapprove and set aside a conviction below and the sentence based thereon is broad and discretionary. United States v Massey, 5 USCMA 514, 18 CMR 138. The legislative background of the Article makes it clear he is empowered so to act for any reason or for no reason. House Report, supra, page 31. The statute, however, was designed substantially to reenact the former practice of convening authorities in all the armed forces. House Report, supra, page 30. There is not a word to be found in its terms or legislative background to indicate that the authority here conferred was intended to apply in any manner to granting an individual absolute immunity. Once more, the express wording of the Article negates such a construction, for its delineation of the powers of a convening authority is, in so many words, limited in exercise to "acting on the findings and sentence of a court-martial." Under such circumstances, the action of the convening authority might well serve to remove the accused's shield of protection under the Constitution, for, by setting aside the findings and sentence, he has placed him in jeopardy and ended any possibility of the accused's punishment. Code, supra, Article 44; cf. Wade v Hunter, supra. Thus, there is complete protection afforded him, and he cannot rely upon his rights under the Fifth

Amendment. Reina v United States, supra. But, where, as here, there has been no court-martial with reference to the charges concerning which it was desired that Kirsch testify, there was nothing on which the convening authority could act in order to protect him against self-incrimination. In consequence, there is simply no rational connection between what might have, under such circumstances, been done to make the accused a usable witness and what my brothers state such statute implies he has the authority to do, *i.e.,* without convening a court or referring a charge to trial, grant an immunity from prosecution which the very statute declares can have no effect unless there has been at least a partial trial and then only on the basis of the protection against double jeopardy. Code, supra, Article 44.

I confess that I am unable to follow such reasoning or to conclude that, since Congress intended to give an officer exercising general court-martial jurisdiction broad authority to process, dispose of, and disapprove court-martial proceedings, it intended also—without intimating such course in any way either by way of hearings, committee reports, or floor debate—to grant that functionary the power to forego such procedures in any case and to accomplish the same result by immunizing any accused from prosecution through means of a simple letter to him. Such rationale is completely contrary to every case decided on the subject by the Federal judiciary, all of which have insisted upon finding a *positive* Congressional enactment to protect the witness —indeed, a statute *"expressly . . .* [authorizing] a grant of immunity" (emphasis supplied), United States v Levy, supra—and who have pointed out the seeming reluctance of the Congress to grant such authority on any broad scale. Sherwin v United States, supra. Indeed, the latter observation is borne out, as I have noted, by the lack of any general statute on the subject, and the careful provision which Congress has made in such limited acts as it has passed that the consent of the Attorney General be secured to the grant. See, for example, 18 USC § 3486. Undoubt-

edly, a convening authority may, as he has for years, promise not to prosecute an individual and thereby secure his cooperation as a witness against another person, such promise in honor and good faith being considered binding upon him if the individual carries out his part of the bargain. Cf. United States v Ford, supra; Shotwell Mfg. Co. v United States, 371 US 341, 9 L ed 2d 357, 83 S Ct 448 (1963). But such a promise, which is the only device to which any of the manuals, supra, addressed themselves prior to the Code, is not that sort of immunity which does away with one's constitutional right to remain silent concerning self-incriminatory matters. United States v Ford, supra; Brown v Walker, supra. This latter type of immunity must be granted by statute enacted by the only body which has constitutional power over both the criminal law and military law. United States v Smith, supra; Ex parte United States, supra. What we do here today is to sustain an executive nullification of Congress' prerogative, and I cannot, in good conscience, join in such a decision.

As to the views espoused by my brother Kilday in his concurring opinion, I can only express my wholehearted disagreement with the proposition that the Supreme Court has in any way impugned the validity of its earlier and frequently expressed view that there must be a statutory basis for the granting of immunity effective to wipe out an accused's right to rely upon his constitutional protection against self-incrimination under the Fifth Amendment. Neither Malloy v Hogan, 378 US 1, 12 L ed 2d 653, 84 S Ct 1489, nor Murphy v Waterfront Commission of New York Harbor, 378 US 52, 12 L ed 2d 678, 84 S Ct 1594 (1964), support that assertion. To the contrary, Malloy v Hogan, supra, deals only with whether the Federal constitutional protection against self-incrimination applies in a state proceeding to compel a witness to testify concerning certain violations of state law. Finding that the questions put to the witness tended in fact to incriminate him under state law, the Court held "the Fourteenth Amendment guaranteed the petitioner the protection of the Fifth Amendment's privilege against self-incrimination, and that under the applicable federal standard, the Connecticut Supreme Court of Errors erred in holding that the privilege was not properly invoked." Id., at page 3. No offer of immunity under either state or Federal law was ever tendered the witness and the question is not discussed in the opinion.

The principle laid down in Malloy v Hogan, supra, however, created the problem confronting the Court in Murphy v Waterfront Commission of New York Harbor, supra. There, the petitioner had been committed for refusal to answer questions put to him, under a grant of immunity *pursuant to a state statute*, on the basis that his replies would incriminate him under Federal law and possibly subject him to Federal prosecution. Having held in Malloy v Hogan, supra, that the Fifth Amendment's privilege against self-incrimination applied to state action, the Supreme Court was faced with the dilemma created by that conclusion on the one hand and the obvious fact that no state possesses the authority to grant immunity which was binding on the Federal courts, the authority of the United States under the Constitution being supreme in its sphere. It found a solution to the difficulty by declaring, at page 79:

"... We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of compelled testimony [obtained by a grant of immunity under state statute] and its fruits. This exclusionary rule, while permitting the States to secure information necessary for effective law enforcement, leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity."

We are here, of course, not confronted with the delicate balancing of relations between separate sovereigns

whose proper execution of their own laws have come into conflict. We are concerned with the basic issue of authority to grant immunity effective enough to eliminate the right of an accused to rely upon his constitutional protection and to subject him to punishment if he refuses to incriminate himself. The Supreme Court in *Murphy,* supra, in no way detracted from its previous holdings that such authority is confided solely to the legislature. Only Mr. Justice White, with whom Mr. Justice Stewart joined, concurring separately, suggested that total immunity was not required in order to invalidate a defendant's reliance upon his privilege, if it were clearly established that neither his admissions nor their fruits could be subsequently used against him in either state or Federal prosecutions. Cf. Counselman v Hitchcock, supra. But even that separate opinion does not discuss the problem presented here, nor does it assign responsibility for immunity grants to any branch of the government other than Congress. In short, while the cases which my brother cites might be of, governing significance in determining whether a *valid* military grant of immunity is sufficient to prohibit Kirsch's prosecution in the ordinary Federal courts, they are quite without value in determining whether there is any authority for the armed services to make such a binding grant. The latter is the fence which I cannot hurdle and, conceding all that Judge Kilday says, I do not find that he has succeeded in climbing the stile either.

Nor may any comfort be drawn from the declaration by the President in the Manual, supra, that statements obtained by making promises of immunity are inadmissible against an accused. Aside from the rather obvious fact that we here deal with a defendant's right not to make a statement despite such promise, as opposed to its subsequent admissibility against him, such would be the law quite without regard to the Manual or, indeed, in face of a contrary provision. As to this, I invite attention to the express provisions of the Code, supra, Article 31, prohibiting the use of "coercion, unlawful influence,

or unlawful inducement" in order to obtain a statement from a suspect and forbidding the receipt of such statement in evidence. Indeed, whether such promise be valid or not, it serves to render a statement coerced and inadmissible as a matter of constitutional law. Thus, the Supreme Court declared, in Shotwell Mfg. Co. v United States, supra, at page 347:

"It is of course a constitutional principle of long standing that the prosecution 'must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.' Rogers v Richmond, 365 US 534, 541, 5 L ed 2d 760, 766, 81 S Ct 735. We have no hesitation in saying that this principle also reaches evidence of guilt induced from a person under a governmental promise of immunity, and where that is the case such evidence must be excluded under the Self-Incrimination Clause of the Fifth Amendment. See Bram v United States, 168 US 532, 542, 543, 42 L ed 568, 573, 574, 18 S Ct 183; Hardy v United States, 186 US 224, 229, 46 L ed 1137, 1140, 22 S Ct 889; Ziang Sung Wan v United States, 266 US 1, 14, 69 L ed 131, 148, 45 S Ct 1; Smith v United States, 348 US 147, 150, 99 L ed 192, 197, 75 S Ct 194. The controlling test is that approved in Bram: ' "a confession, in order to be admissible, must be free and voluntary: that is, . . . not . . . obtained by any direct or implied promises, however slight. . . ." ' Bram v United States, supra, (168 US at 542, 543). Evidence so procured can no more be regarded as the product of a free act of the accused than that obtained by official physical or psychological coercion."

Indeed, we recently unanimously so concluded with regard to an accused's purported statement. United States v Dalrymple, 14 USCMA 307, 34 CMR 87. There, we declared, at page 310:

"Undoubtedly, if an accused is promised immunity from prosecution in return for a confession to crime,

108

such would, as a general proposition, operate to deprive him of the mental freedom to choose either to speak or to remain silent and thus render his statement involuntary."

See also United States v Johnson, 5 USCMA 795, 19 CMR 91, and United States v Howell, 5 USCMA 664, 18 CMR 288.

In light of these considerations, I hardly see how it may be said that a Presidential recordation of a well-established example of the inadmissibility of a coerced confession offers support for the right to demand such a statement and to prosecute him criminally for remaining silent. The reeds upon which my brother relies are, I fear, too slender indeed to support the edifice which he erects upon them.

In sum, then, I would hold that there is no authority under the Uniform Code of Military Justice for an officer exercising general court-martial jurisdiction to grant immunity to an individual member of the services of that particularized nature which removes the latter's right to rely upon his constitutional protection against self-incrimination. That there may be effective arrangements between convening authorities and accused whereby one promises not to prosecute the other in return for his appearance on behalf of the Government does not extend so far as to affect the individual's right to refuse to act on the basis of such promise. Undoubtedly there is a need to secure the services of accomplices and other criminals as witnesses, although, practically speaking, they are usually found available without resort to passage of broad immunity acts. It is, indeed, serving the interests of society to assist in the prompt detection, prosecution, and conviction of guilty parties. But, in the words of Chief Judge Cardozo, regarding the subject before us:

". . . Commanding as those interests are, they do not supply us with a license to palter with the truth or to twist what has been written in the statutes into something else that we should like to see. Historic liberties and privileges are not to bend from day to day 'because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment' . . . are not to change their form and content in response to the 'hydraulic pressure' . . . exerted by great causes. A community whose judges would be willing to give it whatever law might gratify the impulse of the moment would find in the end that it had paid too high a price for relieving itself of the bother of awaiting a session of the Legislature and the enactment of a statute in accordance with established forms." [Doyle v Hofstader, 257 NY 244, 177 NE 489, 498 (1931).]

Concluding that there is no authority under the Uniform Code of Military Justice for an officer exercising general court-martial jurisdiction to grant immunity to a witness who relies upon his right against self-incrimination, I need not reach the question whether such "grant" would be binding in the ordinary Federal courts. Cf. United States v Ford, supra. I record, therefore, my dissent to the proposition there is any such doctrine of immunity authorized within the services and, consequently, would hold it not binding upon the witness quite without regard to the situs of his possible prosecution at a later date. Cf. Murphy v Waterfront Commission of New York Harbor, supra.

I would reverse the board of review and order the charge dismissed.