**UNITED STATES, Appellee,**

v.

**David N. BROWN, Airman, U. S. Air Force, Appellant.**

No. 40891/AF.
CMR No. 22752.

U. S. Court of Military Appeals.

June 28, 1982.

For Appellee: *Captain Richard O. Ely, II* (argued); *Colonel James P. Porter* (on brief); *Captain Michael J. Hoover.*

For Appellant: *Captain J. Laurens Tullock* (argued); *Colonel George R. Stevens* (on brief); *Major Wade B. Morrison.*

## Opinion

EVERETT, Chief Judge:

On September 11, 1979, December 4 and 19, 1979, and January 8–11, 1980, appellant was tried at Edwards Air Force Base, California, by a military judge sitting as a general court-martial and was convicted of several drug offenses. The judge sentenced him to a bad-conduct discharge, confinement at hard labor for 16 months, and total forfeitures. A substitute convening authority approved the findings and the sentence except confinement in excess of 12 months. Then the Air Force Court of Military Review eliminated the forfeitures entirely and, by divided vote, affirmed the remainder of the sentence as approved. 10 M.J. 800 (1981). Subsequently, we granted appellant's petition for review by this Court. 11 M.J. 405, 12 M.J. 22.

### I

Prior to entering his pleas of not guilty, appellant moved "for dismissal of all charges and specifications because the Government has made an immunity—immunity type agreement which they have not kept." In support of this motion, the defense offered a stipulation of fact (Defense Exhibit B), which stated:

During the latter part of September 1979, Captain Lionel J. Mitchell, Defense Counsel, and Colonel Norman L. Paul, the Staff Judge Advocate, discussed granting AB David N. Brown an AFM 39–12, Section F discharge if Brown cooperated with the OSI by giving good drug activity information and participating in controlled drug activities. Colonel Paul discussed this possibility with the Convening Authority, General Philip J. Conley. General Conley told Colonel Paul to pursue the agreement.

Approximately the last week of September Colonel Paul and Captain Mitchell agreed that if the accused gave good drug activity information and participated with the OSI in controlled drug activities the Convening Authority would grant the Section F request or give sentence-clemency relief.

Colonel Paul promised that any information given by the accused would not be used against him in the court-martial. The accused agreed to these conditions.

A few days before the Government pay day at the end of September, Captain Mitchell, the accused, and two OSI agents met at the Headquarters Building at Edwards Air Force Base. The accused gave information regarding the activities of 5 drug dealers at Edwards AFB. The accused further offered to engage in a controlled drug transaction the next weekend which included a military pay date. The OSI did not wish to initiate such an activity. During the next two weeks the OSI did not organize any controlled transactions.

Captain Mitchell communicated by phone with Colonel Paul, asking why such activities were not being pursued. Colonel Paul indicated that the OSI was reluctant to work with the accused but finally agreed to do so by order of the Convening Authority. Colonel Paul perceived that the OSI was not really interested in working with the accused but recognized that the accused was eager to cooperate.

Sometime during mid-October Captain Mitchell and Colonel Paul again discussed the OSI's apparent inaction. Colonel Paul indicated that the OSI was of the opinion that AB Brown was not cooperating with them.

Captain Mitchell suggested to Colonel Paul that the agreement be terminated because of the OSI's apparent inaction. Colonel Paul responded that the Convening Authority wanted to continue the arrangement.

Colonel Paul then told Captain Mitchell that if the accused gave good information and continued his cooperation, as Staff Judge Advocate, he would arrange for the Convening Authority to approve the Section F. He assured Captain Mitchell that the OSI were not as influential with the Convening Authority as he was. Captain Mitchell and the accused agreed to continue the agreement. Before Colonel Paul could evaluate the information given by the accused and consider his participation, Colonel Paul was hospitalized and remains on the seriously ill list at this time. Colonel Paul never recommended to the Convening Authority approval or disapproval of the Section F request. Colonel Paul did not divulge the nature of the agreement with Major Stuart, the Deputy Staff Judge Advocate, nor did he discuss with Major Stuart the OSI's apparent unresponsiveness.

A Section F request for discharge was submitted but was disapproved by the Convening Authority without any communication by the Convening Authority with Colonel Paul.

Also, the defense called as a witness Special Agent Clifford Jones of the Air Force Office of Special Investigations (OSI), whom defense counsel stated "to . . . be an adversary witness under the circumstances." Mr. Jones testified that in late September or early October 1979, he had met with appellant and his defense counsel "pertaining to information that Amn Brown wanted to provide to OSI concerning drug abuse activity on Edwards." [1] Appellant had given to Jones a letter listing the names of certain individuals at Edwards Air Force Base whom he alleged to be using drugs. Mr. Jones recalled telling appellant's defense

counsel something to the effect that the information provided was good. At that first meeting appellant also had volunteered to become engaged in drug buys under the direction and control of the OSI. Mr. Jones claimed to be unaware of any attempts by appellant "to set up controlled deals for the OSI" and stated "that most of the information" which "Brown gave" the OSI "was ambiguous" and "did not meet the requirements we levied on him to eventually engage in successful narcotics operations." However, he also expressed the "opinion that had we been . . . allowed to continue with our activities with Amn Brown that quite possibly as pertains to one individual on this base, . . . we could have had valuable information and most likely have engaged in a successful narcotics operation."

In support of his motion, defense counsel also offered in evidence "the results of a polygraph examination for the specific purpose of impeaching the testimony of the adversary witness, Mr. Jones." The polygraph test—which apparently had been made of appellant at the request of his counsel—indicated that appellant had been truthful when he told the examiner that he had been given $75 by Special Agent Jones for controlled purchases and then had attempted at least three times to "set up" another airman for the OSI. Upon Government objection, the results of the polygraph examination were excluded.

Thereafter, the defense argued that Brown had relied to his detriment on the promise by Colonel Paul, the staff judge advocate, to intervene in his behalf. Moreover, "the Defense's position" was

that the OSI strung Amn Brown along. They didn't like him. They didn't want to work with him. At this point the Government should not be allowed to reap the fruit of such behavior. Instead, the Government should be required to keep their part of the bargain.

1. This meeting, which had been directed by the commander of the OSI detachment to which Jones was assigned, took place long after the charges were referred on June 1, 1979, and

after an Article 39(a), Uniform Code of Military Justice, 10 U.S.C. § 839(a), session in appellant's trial had taken place on September 11, 1979.

To these contentions the trial counsel replied succinctly:

TC: Your Honor, we believe that quite simply the question before this court is moot in that the agreement apparently entered into provides for alternatively Section F approval or sentence clemency relief, and that of course will not be possible unless there is in fact a conviction and sentence imposed. We feel the question is moot.

Without stating his reasons, the military judge then proceeded to deny the motion to dismiss.

The record of trial was reviewed by a substitute convening authority, the Commander of Headquarters Armament Division (AFSC) at Eglin Air Force Base, Florida. His staff judge advocate made these comments concerning appellant's motion to dismiss:

The gist of the agreement is found in Paragraph 3 of the Stipulation of Fact, to wit: that Colonel Paul, the Staff Judge Advocate at the time at Edwards Air Force Base, promised that if the accused gave good information on drug activity to the OSI and participated with the OSI in controlled drug activities, that he (Col Paul) would recommend that the convening authority grant his request for discharge in lieu of court-martial or, in the alternative, that he would recommend that the convening authority grant clemency relief after trial. It is clear from the Stipulation that immunity, within the legal meaning of that term, was not offered to or accepted by the accused. Consequently, the military judge properly denied this motion (R 237). However, with respect to this motion it is incumbent upon you, as the reviewing authority, to keep in mind that such an agreement between the Staff Judge Advocate at Edwards AFB and the accused did exist and that, in fact, the accused did provide some measure of information and cooperation to the OSI, with this agreement in mind (R 232–235, testimony of SA Jones). In determining your action in this case, and in reviewing the clemency information available to you in this case, you should fully consider these factors.

In his *Goode* response,[2] the defense counsel referred to

those facts which strongly support the defense's position. Colonel Paul, the Staff Judge Advocate, was told by defense counsel that the accused would not cooperate with the OSI because of inaction on their part. Col Paul then stated that the convening authority desired to continue the operation, and Colonel Paul then made a guarantee to insure the accused's continued participation. He stated that if AB Brown continued in good faith to cooperate, that as SJA he would insure that the convening authority approved the Section F. The defense believes that as SJA for the General Court-Martial convening authority, Colonel Paul made this assurance as an agent of that authority. The OSI acted dishonest and unethical in working with AB Brown, and the accused's information and participation exceeded that indicated by SA Jones' testimony. The military judge erred in denying the introduction of Defense Exhibit C for identification which was the result of a polygraph examination verifying AB Brown's good faith and dangerous participation with the OSI. The review erroneously does not address this error. The results were introduced for the limited purpose of rebutting the testimony of an adverse witness in support of a motion for dismissal. The results were not introduced as evidence for the merits of the case.

In turn, the staff judge advocate replied: It should be first noted that there is no immunity agreement and there has been no immunity agreement between the accused and the Government. The terms of the agreement, as asserted by counsel at trial, are found at Defense Exhibit B. Basically, the matter referred to by defense counsel is discussion or agreement between Colonel Paul, the then-Staff Judge Advocate at Edwards Air Force

2. *United States v. Goode*, 1 M.J. 3 (C.M.A. 1975).

Base, and defense counsel, the terms of which were that if the accused gave information to and cooperated with the OSI in controlled drug activities, that Colonel Paul would recommend to the convening authority that a Section F discharge be granted (discharge in lieu of court-martial) or that Colonel Paul would recommend that the convening authority grant clemency relief subsequent to trial of the accused. This agreement by its very terms, is clearly not an agreement for any type of immunity. The motion was properly denied by the military judge. However, as you were advised in the earlier SJA Review, you should consider this agreement and consider that the accused did for some period of time provide some information and assistance to the OSI prior to his trial. These actions by the accused should be favorably considered by you in assessing your clemency action.

The Court of Military Review, after condemning "agreements such as the one involved in this case," concluded that nonetheless "the ends of justice require us to recognize this agreement and to effect realistically, any reasonable expectancy of the parties." The court below then reasoned that the charges should not be dismissed—as had been urged by appellant both at trial and on appeal—because "[b]oth conviction and discharge were clearly foreseeable under the agreement." However, since the Court of Military Review did not consider that "approval of a lengthy period of confinement was" expected "under the agreement" and since "the confinement portion of the approved sentence has been effectively satisfied" appellant was given relief by disapproval of the adjudged forfeitures. Dissenting in part, Judge Miles concluded that because of the failure to comply with the reasonable expectation of the parties that any confinement served by appellant would be short, "[i]n the interest of justice and complete fairness and in the face of the government's promise of 'sentence clemency relief' and the staff judge advocate promises," a bad-conduct discharge should not be approved. 10 M.J. at 802.

II

According to the stipulation of fact, Colonel Paul, the staff judge advocate, had discussed granting appellant a Section F discharge if he cooperated with the OSI. Since such a discharge is administrative and cannot be adjudged by a court-martial, the stipulation can be interpreted to mean that Colonel Paul was extending to appellant the inducement that prosecution would be abandoned if he gave sufficient assistance in OSI drug detection activities. Moreover, the inducement was offered with the full concurrence of the convening authority, General Conley. Thereafter, an agreement apparently was reached whereunder appellant might receive either a Section F discharge or "sentence-clemency relief." The language of the stipulation is somewhat ambiguous, since it seems consistent with any of at least three diverse alternatives: (a) appellant would receive an administrative discharge and no court-martial; (b) appellant might receive a court-martial, but in that event, as a matter of clemency, he would be allowed to remain in the Air Force even if a punitive discharge were adjudged; or (c) appellant might be court-martialed in which event he would receive clemency that would not necessarily include disapproval of any bad-conduct discharge adjudged by the court-martial.

In mid-October, when defense counsel "suggested to . . . [the staff judge advocate] that the agreement be terminated . . . Colonel Paul responded that the Convening Authority wanted to continue the arrangement." From the wording of the stipulation of fact, it would appear that at this stage "the arrangement" was being viewed by the parties as directed to a Section F discharge, rather than to some form of clemency.

An agreement to approve a Section F discharge is not an explicit agreement for immunity from prosecution, for apparently an application for such a discharge can be approved after trial while the applicant is serving any sentence adjudged by a court-martial. If, however, an admin-

258

istrative discharge were issued before trial for an offense, it would have the same effect as a grant of immunity from trial by court-martial, since receipt of the discharge would terminate the military status which is essential for prosecution. *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955).[3] Whatever the proper characterization of "the arrangement" made in this case, it certainly fell within the authority of General Conley, who was an officer exercising general court-martial jurisdiction, *see* para. 68*h*, Manual for Courts-Martial, United States, 1969 (Revised edition), and who also could approve a Section F discharge.

■ During his last discussion with the defense counsel, Colonel Paul apparently committed himself as to the recommendation he would make if he concluded that appellant's assistance to the OSI was of substantial value. Since the staff judge advocate had been entrusted by General Conley with the responsibility of negotiating an agreement with appellant, Colonel Paul was entitled to represent to the defense counsel what he would recommend and what he believed the effect of the recommendation would be. Innumerable cases have been settled on the basis of discussions in which an attorney induced a settlement offer by representing what recommendation he would make to his clients concerning acceptance of the offer and what he believed his client's reaction would be to the recommendation. Indeed, among attorneys it is readily recognized that a lawyer's recommendation to his client often will determine what that client will do.

In military law administration, it is foreseeable that a commander will rely on the advice of his staff judge advocate; indeed, in some instances, he is required to give reasons if he does not do so. *See* para. 85*c*, Manual, *supra*. Moreover, Colonel Paul, the staff judge advocate, had expressly represented to appellant's defense counsel that

he was "influential with the Convening Authority." Obviously this representation was made so that appellant would anticipate acceptance by the convening authority of any recommendation by his staff judge advocate that Brown receive a Section F discharge.

■ In view of the various offers made to him by Colonel Paul, appellant and his counsel could reasonably have concluded that if Brown's services were of sufficient merit *as evaluated by the staff judge advocate*, at the very least, that officer would recommend to General Conley that appellant's request for an administrative discharge be approved. Reasonably relying on these assurances, Brown rendered services as an informant—perhaps with some resulting personal risk. While the testimony of Special Agent Jones leaves in doubt how much value the OSI attached to the information which Brown provided, appellant was entitled to an evaluation by the staff judge advocate and not merely by the OSI. Of course, Colonel Paul could give such weight as he chose to the OSI's appraisal of appellant's contribution. Likewise, Colonel Paul would be free to consider the polygraph test results, which indicated that appellant had made significant efforts to assist the OSI. *Cf. United States v. Massey*, 5 U.S.C.M.A. 514, 18 C.M.R. 138 (1955).

The serious illness of the staff judge advocate frustrated performance of the promises which had been made to appellant, since Colonel Paul was physically unable to make the bargained for evaluation of appellant's services. We find in the record no adequate replacement for the evaluation promised by Colonel Paul. Indeed, since the record of trial was reviewed by a substitute convening authority located some 2,000 miles away from Edwards Air Force Base, appellant did not even receive the benefit of a personal evaluation of his services by General Conley, who had initially authoriz-

---

3. Of course, receipt of an administrative discharge would not terminate amenability to prosecution in a federal or state court that might have concurrent jurisdiction over the offense. Likewise, it is unclear whether a grant of immunity under paragraph 68*h* of the Manual for Courts-Martial, United States, 1969 (Revised edition), would preclude prosecution in a civil court.

ed Colonel Paul to proceed with an agreement.

Furthermore, we cannot infer that it was unlikely Colonel Paul would have recommended approval of a Section F discharge or that the convening authority would have accepted such a recommendation. The staff judge advocate who reviewed the case for the substitute convening authority seems to have recognized that services of value were rendered by appellant. The Court of Military Review apparently reached a similar conclusion. Thus, it appears probable that Colonel Paul would have made a recommendation favorable to appellant and that, at worst, Brown would have received an administrative discharge under Section F and served little, if any, confinement.

Under these circumstances we subscribe fully to the view of Judge Miles in the Court of Military Review that, having served 12 months of confinement, appellant was entitled to relief which went beyond setting aside the forfeitures. Indeed, under the circumstances of this case, it is necessary to go even further than Judge Miles and to set aside the findings and sentence in their entirety, since it seems quite likely that if Colonel Paul had not become seriously ill, appellant would never even have been tried by court-martial.

■ We realize that, as observed by the Court of Military Review, such informal "agreements" create many problems. However, in dealing with certain offenses—such as those involving drugs—reliance often must be placed on persons who give information and make controlled purchases in return for promised leniency as to the punishment for their own misdeeds. As recognized in Service programs designed to protect the safety of informants, cf. *United States v. Killebrew*, 9 M.J. 154 (C.M.A.

1980), the cooperation furnished may entail considerable hazard for an informant. Sometimes an understanding which is reached will be informal; typically it will be entered without the safeguards employed in a providence inquiry when a guilty plea has been offered.[4] If, however, the Government seeks to give a narrow construction to such understandings, in the long run it will not obtain the requisite cooperation. This is especially true where, as here, continuing services are to be furnished by the informer in ferreting out ongoing criminal enterprises. Thus, not only fair play but also legitimate law enforcement interests require ungrudging enforcement of "agreements" like that in the case at bar. *See Cooke v. Orser*, 12 M.J. 335, 358 (C.M.A.1982) (Everett, C. J., concurring).

Unfortunately, the obligations to which the Government was subject were not fulfilled. While there was no intentional breach of the agreement, the consequences of the frustration of performance because of the staff judge advocate's serious illness should be visited here on the Government, rather than on this accused.[5]

Accordingly, the decision of the United States Air Force Court of Military Review is reversed. The findings and sentence are set aside. The charges are dismissed.

FLETCHER, Judge (concurring in the result):

I said in *United States v. Hardin*, 7 M.J. 399, 404 (C.M.A.1979):

It must be remembered that for the convening authority and the staff judge advocate, in their pretrial rather than in their post-trial, codal posture, these functions are exercised in a prosecutorial context.

---

4. The circumstances generally do not permit a military judge to inquire in open court about the terms of such agreements when they are being negotiated and the informant may not be represented by an attorney.

5. Since my concurring opinion in *Cooke v. Orser*, 12 M.J. 335, 353 (C.M.A.1982), already an-

swers most of the points made in the dissent here—which correspond to the arguments made in Judge Cook's dissenting opinion there—I shall not now reiterate the discussion, but rather I simply incorporate it by reference here.

The facts of the present case as posited by Chief Judge Everett unmistakably confirm this reality of military life. As envisioned in the Uniform Code of Military Justice and the Manual for Courts-Martial, the convening authority and his legal counsel are the principal law enforcement officers within the command, responsible for the investigation and prosecution of criminal offenses by service members. *See* Article 6(b), Uniform Code of Military Justice, 10 U.S.C. § 806(b).

This structure within the military justice system was not newborn in *United States v. Hardin, supra.* In fact, it is a mere restatement of the traditional view that a commanding officer assisted by his staff judge advocate is responsible for the discipline and order of the soldiers under his command. *See* Article 3, Section XIV, Articles of September 20, 1776; Article 6, Articles of May 31, 1786. This structural relationship has continued from the time when a court-martial was a *parens patriae assize*[1] to a court of limited jurisdiction,[2] whose nature is adversary,[3] presided over by a judge.[4]

Plea discussions including an offer to forego prosecution as a part of a pretrial agreement unquestionably fall within the scope of these prosecutorial functions.[5] To classify these particular functions as judicial in nature is to betray reality for convenience.[6]

There are those who will not subscribe to any of my thinking as set out above; to these I offer no further argument. There will be others who will agree that the staff judge advocate acts in this area as a prosecutor, but argue that he cannot bind the convening authority. To the latter, where I perceive the convening authority in an active and continuous prosecutorial role, I offer a quotation from *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971), which states:

> It is now conceded that the promise to abstain from a recommendation was made, and at this stage the prosecution is not in a good position to argue that its inadvertent breach of agreement is immaterial. The staff lawyers in a prosecutor's office have the burden of "letting the left hand know what the right hand is doing" or has done. That the breach of agreement was inadvertent does not lessen its impact.

In the present matter under the facts set forth in the lead opinion, I agree that appellant's posture in pleading "rests in ... [a] significant degree on a promise or agreement of the prosecutor."[7] I therefore concur in the result. *See generally Cooke v. Orser*, 12 M.J. 335 (C.M.A.1982); *United States v. Kazena*, 11 M.J. 28 (C.M.A.1981), and *United States v. Dawson*, 10 M.J. 142 (C.M.A.1981).

COOK, Judge (dissenting):

Because I cannot agree either with my Brothers' factual determinations or with their legal conclusions, I must respectfully dissent.

---

1. Article 6, Articles of May 31, 1786, provided (less prescribed oaths):

   The judge advocate, or some person deputed by him, or by the general or officer commanding the army, detachment or garrison, shall prosecute in the name of the United States of America; but shall so far consider himself as counsel for the prisoner, after the said prisoner shall have made his plea, as to object to any leading question, to any of the witnesses, or any question to the prisoner, the answer to which might tend to criminate himself; and administer to each member the following oaths, which shall also be taken by all members of regimental and garrison courts-martial.

2. *Runkle v. United States*, 122 U.S. 543, 7 S.Ct. 1141, 30 L.Ed. 1167 (1887).

3. Act of June 4, 1920, 41 Stat. 787, 812.

4. Article 26, Uniform Code of Military Justice, 10 U.S.C. § 826.

5. ABA Standards, The Prosecution Function, Parts III and IV (1971).

6. *See* Douglass, *Changing Roles from Judge to Prosecutor*, 5th Annual Homer Ferguson Conference on Appellate Advocacy (1980); Hansen, *Judicial Functions for the Commander?*, 41 Mil.L.Rev. 1 (1968).

7. *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971).

This case involves another alleged pretrial agreement, the performance of which by both parties was contested both at trial and on appeal. Because the illness of the staff judge advocate prevented him from testifying, we must piece together the facts to ascertain the intentions of the parties involved.

The trial began with an Article 39(a)[1] pretrial session on 11 September 1979. After pleas of not guilty were entered, individual defense counsel withdrew them for the purpose of making various motions. It was agreed that a continuance would be proper to allow the defense a chance to interview a recently discovered witness, but in the interest of saving time, the defense decided to litigate several motions. After hearing testimony and making rulings, the military judge recessed the trial until 4 December 1979. Sometime during the recess the accused submitted a request for administrative discharge in lieu of court-martial pursuant to Air Force Manual 39–12, Section F. On 16 November 1979, defense counsel "learned" that the request had been denied. When the trial resumed on 4 December 1979, a further continuance was granted for the defense to examine certain evidence then held by the Air Force Office of Special Investigations (OSI). Part of the reason for seeking this evidence was defense counsel's attempt to determine whether there had been an agreement between the accused and the staff judge advocate (Colonel Paul) whereby the latter was to take certain actions on the accused's Section F request. Attempts to contact the staff judge advocate had been frustrated by his serious illness which necessitated his evacuation to a military hospital in Texas. On 19 December 1979 at another pretrial hearing defense counsel related that he had held a brief long-distance telephone conversation with the staff judge advocate, in which "he basically remembered that an agreement had been made between . . . [him], as the Staff Judge Advocate and AB Brown." Trial counsel, recognizing the difficulty of calling the staff judge advocate

as a witness, offered to stipulate to an offer of proof. The trial counsel stated:

It's our understanding that there was an agreement made between Col Paul and Amn Brown for Col Paul to make a recommendation to the Convening Authority in this case as to the disposition of charges. We have learned approximately an hour ago that a recommendation was made by Col Paul, communicated through Major Stuart, to the Convening Authority. We are prepared to call Major Stuart for that purpose to testify that he had relayed the recommendation for Colonel Paul. We think now that the posture of that agreement is not of a character that would preclude further proceedings in this matter. We don't think the agreement was one that bound the Convening Authority, but merely made a representation to the Convening Authority that a recommendation would be made. Apparently that was made and was disregarded and should not impede these proceedings any further.

Defense counsel responded:

Your honor Captain Bouchard is taking me off guard. What he mentioned was totally opposite of what I remember from discussion with Colonel Paul.

After the lunch recess, defense counsel offered to summarize "some discussions about the issue that was raised by the Defense just prior to our recess."

DC: To put this in the proper posture the Defense makes another request for continuance until I believe 8 January 1980. The purpose of this request is to give the Defense time to properly investigate all of the facts and circumstances surrounding the pre-trial agreement between the Staff Judge Advocate, Col Paul, and Amn Brown and his Counsel.

For the record, during the recess Trial Counsel, . . . and Defense Counsel talked personally with the Convening Authority, and the Convening Authority did not have a remembrance of any communication or directive from Col

1. Uniform Code of Military Justice, 10 U.S.C. § 839(a).

Paul, personally or through any other individual from Col Paul, about the recommendation from him as to a pre-trial agreement.

The case was continued until 8 January 1980.

On 10 January 1980 the matter of the pretrial agreement was again raised as the basis of a defense motion for dismissal of the charges. In support of the motion the stipulation set forth in the lead opinion was offered and accepted by the military judge, who said:

I don't see anything in here about clemency—I'm sorry—I mean about immunity. The stipulation is to the effect that the convening authority would grant a Section F request or give sentence clemency relief.

In further support of his motion defense counsel called Special Agent Jones of the base OSI detachment who testified in pertinent part that the accused had provided to the OSI a form letter listing names of individuals on the base who allegedly were using drugs and had offered to engage in buying drugs. When asked his opinion as to the value of the information provided by the accused, Special Agent Jones testified:

It's my opinion that had we been able or had been allowed to continue with our activities with Amn Brown that quite possibly as pertains to one individual on this base, yes, we would have had valuable information and most likely have engaged in a successful narcotics operation.

.    .    .    .    .

It's my opinion that most of the information Amn Brown gave us was ambiguous, was not—I'm not quite sure how to put this—did not meet the requirements we levied on him to eventually engage in successful narcotics operations.

In arguing in support of his motion defense counsel gave his version of the agreement as follows:

As the stipulated facts indicate, in late September Col Paul and the Defense Counsel discussed an immunity type agreement. Col Paul talked with the

convening authority about Airman Brown more or less helping to clean up Edwards Air Force Base in exchange for an Air Force Manual 39–12, Section F discharge or possibly sentence clemency should he be convicted and sentenced.

Col Paul told the Defense Counsel the convening authority wanted to enter the agreement, and the accused ultimately agreed also.

However, it's the Defense's position that consistent with the rest of this case, the OSI were dragging their feet. Even the Staff Judge Advocate wondered why. As you can see, the Defense Counsel complained to Col Paul several times that very little was being done and to ask Col Paul to more or less intervene and to check into it.

Eventually, Defense Counsel became so concerned that he discussed with Col Paul that the accused may discontinue his participation. Col Paul at this point indicated that the convening authority more or less wanted to continue. The Defense Counsel was told by Col Paul that he would more or less see to it that the Section F be granted if the accused continued his cooperation and if his cooperation was of the same caliber as previously agreed. The Defense relied on this assurance and continued to cooperate.

It appears the OSI was more or less playing games with Amn Brown. Amn Brown gave evidence about approximately five drug dealers at Edwards, which at one point was considered good evidence or pretty good evidence by the OSI according to Mr. Jones, although he reneged somewhat on that at the request of Trial Counsel or at his questioning. Of course, they've changed their minds about whether or not it was good evidence at this point.

Before the agreement was finally consummated, Col Paul became ill. He was not able to review all of the facts on Amn Brown's side and the OSI's side. Col Paul never communicated with Major Stuart about his opinions of the OSI dragging their feet and not participating. A decision was made to disapprove the

Section F request for discharge. And subsequently the convening authority did in fact disapprove the request for discharge.

Amn Brown has relied to his detriment on Col Paul's promise to intervene in his behalf. Col Paul became ill and was unable to communicate either to the Acting Staff Judge Advocate or the convening authority the facts and circumstances surrounding his participation in the case. As Staff Judge Advocate, he, of course, had a persuasive relationship with the convening authority, but he was never able to act upon the agreement because of his illness.

It's the Defense's position that the OSI strung Amn Brown along. They didn't like him. They didn't want to work with him. At this point the Government should not be allowed to reap the fruit of such behavior. Instead, the Government should be required to keep their part of the bargain.

Trial counsel responded:

Your Honor, we believe that quite simply the question before this court is moot in that the agreement apparently entered into provides for alternatively Section F approval or sentence clemency relief, and that of course will not be possible unless there is in fact a conviction and sentence imposed. We feel the question is moot.

The military judge denied the motion to dismiss without further elaboration.

With this factual predicate, I consider certain words in the stipulation to be significant. In the first paragraph the staff judge advocate "*discussed* granting" the accused an administrative discharge and he "*discussed* this possibility with the Convening Authority," who told him "to *pursue* the agreement." I assume that at this time the agreement was in an inchoate state. However, shortly thereafter, the staff judge advocate and the defense counsel "*agreed* that if the accused gave good ... information" and cooperated with the OSI, "the Convening Authority *would* grant the Section F request *or* give sentence-clemency relief." Here, the agreement seems to have been finalized with the option left to the convening authority as to what action he would take if the accused performed as agreed. The staff judge advocate also promised that any information given to him by the accused would not be used against him in the court-martial. Later, it appears, after some cooperation by the accused with the OSI, the defense counsel and the staff judge advocate "discussed the OSI's apparent inaction." Defense counsel "suggested ... that the agreement be terminated," but the staff judge advocate indicated "that the Convening Authority *wanted* to continue the arrangement" and he "told ... [the defense counsel] that *if* the accused gave good information and continued his cooperation" with the OSI "he would *arrange* for the Convening Authority to approve the" administrative discharge request. However, "[b]efore ... [the staff judge advocate] could evaluate the information given by the accused and *consider* his participation," he became ill and "never recommended to the Convening Authority approval or disapproval of the ... [administrative discharge] request." (Each emphasis added).

Thus, in the first agreement the convening authority had the *option* either to approve the administrative discharge request or give sentence relief. After the defense counsel indicated his dissatisfaction with the operation of that agreement, a second agreement was made between the defense counsel and the staff judge advocate whereby the latter would *recommend* action to the convening authority. In the first agreement the discretion of which action to take was left to the convening authority presumably on the basis of his analysis of the importance of the information and cooperation of the accused, and in the second (or modified) agreement, the staff judge advocate agreed to "arrange for the Convening Authority to" take action on the administrative discharge request presumably if *he* were satisfied with the accused's information and participation with the OSI.

After the trial the record was forwarded for review to a substitute convening author-

ity. In his review the staff judge advocate discussed the defense motion based on the agreement. He wrote:

The gist of the agreement is . . . that Colonel Paul, the Staff Judge Advocate at the time at Edwards Air Force Base, promised that if the accused gave good information on drug activity to the OSI and participated with the OSI in controlled drug activities, that he (Col Paul) would recommend that the convening authority grant his request for discharge in lieu of court-martial or, in the alternative, that he would recommend that the convening authority grant clemency relief after trial. It is clear from the Stipulation that immunity, within the legal meaning of that term, was not offered to or accepted by the accused. Consequently, the military judge properly denied this motion . . . However, with respect to this motion it is incumbent upon you, as the reviewing authority, to keep in mind that such an agreement between the Staff Judge Advocate at Edwards AFB and the accused did exist and that, in fact, the accused did provide some measure of information and cooperation to the OSI, with this agreement in mind . . . In determining your action in this case, and in reviewing the clemency information available to you in this case, you should fully consider these factors.

Further on in the review, the staff judge advocate recommended that the sentence to confinement at hard labor be reduced by 4 months.

The reasons for the recommended reduction in confinement time are (1) to deduct the 42 days illegal pretrial confinement pursuant to the order of the military

judge, (2) the accused's possible reliance on representations made by the then-Staff Judge Advocate, Colonel Paul, through defense counsel and the accused's cooperation in criminal investigation with the OSI as Edwards AFB, Ca. . . ., and (3) other matters presented in the clemency hearing of the accused. As to the remainder of the sentence to confinement and the remainder of the sentence, I feel the sentence is just, fair, and appropriate. A bad conduct discharge is appropriate because of the number of offenses and the nature of the offenses of which the accused was convicted.

I agree with the rationale of the staff judge advocate. What the agreement clearly envisioned was *either* administrative discharge *or* sentence relief. I see nothing in the agreement or in the record to indicate that immunity from prosecution was intended. This appears particularly evident when considered in light of the fact that the trial was already in progress when the agreement was first offered and accepted. What the accused bargained for was clemency at the discretion of the convening authority and a recommendation for clemency by the staff judge advocate to the convening authority, but both actions were conditioned on satisfaction with the performance by the accused. We have no way of knowing what the staff judge advocate would have done had his serious illness not intervened.[2] The agreement was analogous to a personal service contract. The rule covering such contracts is that death or incapacity of the specific person necessary to perform the promise constitutes an impossibility as will excuse the promisor's duty to perform. Simpson, Contracts § 177 (2d ed.

---

**2.** I agree with the Court of Military Review's condemnation of such agreements:

They are not sanctioned by Air Force Regulation, policy or practice or by previous decisions of the United States Court of Military Appeals or by this Court. Moreover, they are pernicious and disruptive of the due administration of military justice. When oral, as here, they are difficult or impossible to interpret or enforce. Both the staff judge advocate and the defense counsel must have been aware of the dangers involved and their

lack of standing under the military justice system or the Air Force Regulations.
10 M.J. 800, 802 (1981).

Defense counsel must also be charged with the knowledge that Colonel Paul might not have been able to perform as agreed. He might have died or transferred as well as become ill. In such situations his successor would have to perform the evaluation and, if warranted, make the recommendation. In fact the staff judge advocate to the successor convening authority did attempt to fulfill these obligations.

1965); Restatement, Contracts, § 459. However, since the accused performed, at least to some extent, his part of the agreement, he is entitled to some relief. Simpson, *supra*, § 181. Obviously, the value of his performance cannot be ascertained here, and, of course, he cannot be restored to the *status quo ante*. But dismissal of the charges is not appropriate. The successor staff judge advocate did recommend sentence clemency relief and the successor convening authority did reduce the sentence in accord with that recommendation. Hence, the accused cannot complain that the Government took no action to attempt to rectify any injustice he may have suffered by the inability of Colonel Paul to perform as agreed. I do not believe that the result here denied the accused due process.

What separates me irreconcilably from my Brothers is the remedy they impose. Ignoring the alternative option of sentence relief, they interpret the agreement as promising an administrative discharge in lieu of court-martial. I think the facts related above establish the weakness of such logic. However, in addition I think they misapply the law.

It has long been recognized "that the federal government will not be bound by a contract or agreement entered into by one of its agents unless such agent is acting within the limits of his actual authority." *United States v. D'Apice*, 664 F.2d 75, 78 (5th Cir. 1981). One who deals with an agent of the Government "takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947), quoted in *Dresser Industries, Inc. v. United States*, 596 F.2d 1231, 1236 (5th Cir. 1979), *cert. denied*, 444 U.S. 1044, 100 S.Ct. 731, 62 L.Ed.2d 730 (1980). "If the rule were otherwise, a minor government functionary hidden in the recesses of an obscure department would have the power to prevent the

prosecution of a most heinous criminal simply by promising immunity in return for the performance of some act which might benefit his department. Such a result could not be countenanced." *United States v. D'Apice, supra* at 78, quoting *Dresser Industries, Inc. v. United States, supra* at 1236–37. While the staff judge advocate cannot reasonably be equated with "a minor government functionary," particularly when he purported to act with the concurrence of a general court-martial convening authority, the principle is still valid. In order to bind the convening authority to a promise of immunity, there must be some express indication of his assent to the agreement. I do not believe that a staff judge advocate can grant immunity from prosecution or that he can, by his own act, bind the convening authority to such a promise, irrespective of any reliance thereon by the accused and his counsel. *See Cooke v. Orser*, 12 M.J. 335, 365 (C.M.A.1982) (Cook, J., dissenting). As was held in *Dresser Industries, Inc. v. United States, supra* at 1237:[3]

> In general, the conduct of litigation in which the United States is a party is reserved to officers of the Department of Justice, under the direction of the Attorney General. 28 U.S.C. § 516. More specifically, the United States Attorneys have the responsibility to prosecute all offenses against the United States, "[e]xcept as otherwise provided by law." 28 U.S.C. § 547. The decision to prosecute is largely unreviewable by the courts . . . . Furthermore, courts have held that not even a United States Attorney can bind his counterpart in another district to dismiss an indictment, . . . and that even prosecutors have no power to grant immunity in the absence of a statute specifically conferring it. [Citation omitted.]

In the military justice system the power to grant immunity is reposed in the general court-martial convening authority. Para. 68*h*, Manual for Courts-Martial, United

---

**3.** "[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nix-* on, 418 U.S. 683, 693, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974).

States, 1969 (Revised edition). Such power was found by this Court to be derived from the power of the convening authority to discontinue investigations of crimes, dismiss formal charges, direct a charge be withdrawn, and set aside findings of guilty, which are plenary in nature. *United States v. Kirsch*, 15 U.S.C.M.A. 84, 35 C.M.R. 56 (1964). Vesting such authority only in a person highly situated in the military justice system indicates to me the intention of the President that such authority should only be exercised by one having the rank and position to fully understand the ramifications and consequences of his act.[4] I find no authority either in the Code or the Manual which would allow delegation of such power by the convening authority. "[W]henever Congress conferred a power upon a particular authority in the court-martial system and intended that authority to give others the right to exercise the power, it expressly provided for such designation." *United States v. Butts*, 7 U.S.C.M.A. 472, 474, 22 C.M.R. 262, 264 (1957). Finding no such express delegatory authorization, I can

only conclude that the authority to grant immunity from prosecution can only be exercised by the general court-martial convening authority. Thus, "[s]ince the . . . [convening authority's] agents lacked actual authority to contractually limit the prosectional function of the . . . [Government], any such agreement with . . . [the accused] would be unenforceable." *Dresser Industries, Inc. v. United States*, supra at 1237 (footnote omitted). Even if the view of my Brother Fletcher that the staff judge advocate is a "prosecutor" is adopted, no power can be found in the staff judge advocate to grant immunity from prosecution.

This case is readily distinguishable from *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). First, the agreement here did not constitute plea bargaining; the accused pleaded not guilty and hotly contested the prosecution's evidence. Second, there was no question that the first prosecutor in *Santobello* had *actual* authority to make the bargain relied on by the defendant, and the Supreme Court had no hesitation in enforcing the agreement.[5]

4. Hearings on H.R. 2498 before a Subcommittee of the House Committee on Armed Services, 81st Cong., 1st Sess., pp. 1182–84 (1949); *United States v. Kirsch*, 15 U.S.C.M.A. 84, 35 C.M.R. 56 (1964). *See generally United States v. Alessio*, 528 F.2d 1079 (9th Cir. 1976), *cert. denied*, 426 U.S. 948, 96 S.Ct. 3167, 49 L.Ed.2d 1184 (1976).

5. Santobello pleaded not guilty to felony charges. "After negotiations, the Assistant District Attorney in charge of the case agreed to permit . . . [Santobello] to plead guilty to a lesser-included offense" having "a maximum prison sentence of one year" and further "agreed to make no recommendation as to the sentence." Santobello then withdrew his not guilty pleas and pleaded guilty. "The [trial] court accepted the plea and set a date for sentencing." Three months later Santobello, having acquired a new counsel and the knowledge that the "evidence against him had been obtained as a result of an [allegedly] illegal search," moved to withdraw his guilty plea. This motion was denied and several months later Santobello "appeared before a different judge" and a second prosecutor for sentencing. "The new prosecutor . . . [argued for] the maximum one-year sentence . . . . Defense counsel . . . objected on the ground that the State had promised . . . that there would be no sentence recommendation by the prosecution." "The second prosecutor . . . argued that there was

nothing in the record to support petitioner's claim of a promise." The sentencing judge dismissed Santobello's contentions, saying, "It doesn't make a particle of difference what the District Attorney says he will do, or what he doesn't do . . . . I have here a . . . long, long serious criminal record." 404 U.S. 257, 258–59, 92 S.Ct. 495, 497, 30 L.Ed.2d 427 (1971). He then imposed the maximum sentence. The Supreme Court reversed and remanded the case to the state courts to decide whether there should be specific performance of the plea agreement and sentencing by another judge or whether Santobello should be allowed to withdraw his plea, holding:

> Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.

On this record, petitioner "bargained" and negotiated for a particular plea in order to secure dismissal of more serious charges, but also on condition that no sentence recommendation would be made by the prosecutor. It is now conceded that the promise to abstain from a recommendation was made, and at this stage the prosecution is not in a good position to argue that its inadvertent breach of agreement is immaterial. The staff law-

*See Dresser Industries, Inc. v. United States, supra* at 1237 n.4; *see also Geisser v. United States,* 513 F.2d 862 (5th Cir. 1975).

My Brothers seem intent on establishing a rule that if some Government agent makes any agreement with an accused even without authority to do so and the accused relies on the agreement to any extent, the Government must be "punished" by enforcing the agreement in its broadest form for the benefit of the accused. *See Cooke v. Orser, supra* at 345. Such a philosophy totally ignores "the public interest in having the guilty brought to book," *United States v. Blue,* 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510 (1966), and makes the public the "loser" when a guilty person is released without punishment. *See People v. Reagan,* 395 Mich. 306, 235

N.W.2d 581, 590 (1975) (Coleman, J., dissenting). To overturn an otherwise correct verdict for less than acts amounting to a deprivation of fundamental fairness is simply not required by the law of this or any other court. It is well to remember the words of Justice Stone in *McGuire v. United States,* 273 U.S. 95, 99, 47 S.Ct. 259, 260, 71 L.Ed. 556 (1927):

A criminal prosecution is more than a game in which the government may be checkmated and the game lost merely because its officers have not played according to rule.

Continuing down this course will only bring this Court further from the law as pronounced by the Supreme Court of the United States and the other Federal Courts.

yers in a prosecutor's office have the burden of "letting the left hand know what the right hand is doing" or has done. That the breach

of agreement was inadvertent does not lessen its impact.

*Id.* at 262, 92 S.Ct. at 498.