### UNITED STATES

v.

**Airman Basic Johnnie L. YOUNG, Jr., FR 559–33–8669 United States Air Force.**

**ACM 23733.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 9 Aug. 1982.

Decided 8 April 1983.

Appellate Counsel for the Accused: Colonel George R. Stevens, Major Richard A. Morgan and Captain Neil S. Richman, USAFR.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert and Major Michael J. Hoover.

Before HODGSON, HEMINGWAY and MILLER, Appellate Military Judges.

## DECISION

HODGSON, Chief Judge:

Pursuant to his pleas, the accused was convicted of conspiring to commit larceny, larceny, and burglary, in violation of Articles 81, 121 and 129, U.C.M.J., 10 U.S.C. §§ 881, 921, 929. The approved sentence extends to a bad conduct discharge, confinement at hard labor for 12 months and 24 days, and forfeiture of $200.00 per month for 14 months. In a single assigned error the accused argues that a pretrial agreement exists between himself and the staff judge advocate, who was acting on behalf of the convening authority, to separate him with an administrative discharge. Accordingly, the charges should be dismissed. We disagree and affirm.

After hearing extensive evidence on this issue, the trial judge made exhaustive findings of facts, which are set out in the Appendix.

Appellate defense counsel argue that although no formal written agreement exists between the parties, there was an understanding that if the accused performed certain acts the Government would grant clemency in *some* form. They maintain the staff judge advocate had the authority to negotiate a pretrial agreement with the accused, albeit he may have had to return to the convening authority for final approval. The prefatory discussions between the trial defense counsel and the staff judge advocate centered around four points: (1) the accused would testify against his co-conspirator if required; (2) the accused would plead guilty to the charges against him; (3) he would cooperate with the OSI drug suppression operation; and (4) he would testify in trials against other military members. If these conditions were met, the staff judge advocate would in return, recommend to the convening authority either a special court-martial or a Section F discharge.[*] The accused contends that since he performed 3 of 4 conditions discussed in the preliminary negotiations, there was substantial compliance with the basic provisions. Appellate counsel acknowledge that the accused initially refused to testify against the drug traffickers he had identified, but he subsequently changed his mind, and at trial was ready, willing and able to meet that requirement. The accused asserts that these facts, *in toto*, establish that the Government derived great benefit from his cooperation, and should be required to abide by the terms discussed in the preliminary negotiations. He maintains that not only fair play but also legitimate law enforcement interests demand that the agreement as discussed by the parties be enforced. *United States v. Brown*, 13 M.J. 253 (C.M.A.1982).

---

[*] In effect, a separation in lieu of trial by court-martial. See Air Force Regulation 39–10, (10 October 1982), Administrative Separation of Airmen, para. 4–1.

The issue before the Court could have been avoided had the parties followed the explicit Air Force guidance on the subject. Air Force policy is clear that offers for pretrial agreements will be in writing. Air Force Manual 111–1(C4) (2 July 1973), Military Justice Guide, paragraph 4–8b states:

Pretrial plea agreements will be in writing and signed by the accused, his or her counsel and the convening authority. Oral agreements are prohibited as are promises by staff members to intervene on the accused's behalf in some manner in exchange for a guilty plea.

Why both parties chose to ignore the requirement that offers for pretrial agreements be in writing is unknown. Requiring that a plea bargain offer be in writing helps insure that it will be accomplished in a manner reasonably fair to the accused. *United States v. Kazena,* 11 M.J. 28 (C.M.A. 1981). However, we are convinced that no pretrial agreement existed between the accused and the staff judge advocate who was acting on behalf of the convening authority. The parties could be best described as "sparring" with each other to find a common position that each could accept. Appellate counsel, while arguing that an agreement existed, conceded that the conditions changed constantly. Stated as contract law, there were several offers and counter-offers, with the parties never agreeing to the exact terms or even attempting to define them.

We are aware that some of the participants, and indeed the setting in the instant case, are the same as in *United States v. Brown, supra,* where the Court of Military Appeals enforced an agreement, and dismissed the charges; but here, as appellate defense counsel observed in their brief, the facts are substantially different. In *Brown, supra,* there was an *agreement* given the accused that in return for his assistance in suppressing drug traffic, the convening authority would approve a Section F request or give sentence-clemency relief. *See United States v. Brown,* 10 M.J. 800 (A.F.C.M.R.1981). Here the facts clearly establish that no agreement was reached as there was no "meeting of the minds."

Even accepting, *arguendo,* that an inchoate accord was concluded, the accused breached it by stating his intention not to testify against other service members. *See generally Shepardson v. Roberts,* 14 M.J. 354 (C.M.A.1983). We find that no pretrial agreement existed between the parties. Accordingly, the trial judge was correct when he declined to dismiss the charges. *See generally Cooke v. Orser,* 12 M.J. 335 (C.M.A.1982). The findings of guilty and sentence are

AFFIRMED.

HEMINGWAY, Senior Judge, concurs.

MILLER, Judge, absent.

## APPENDIX

MJ: Thank you. The Defense's motion to dismiss is denied. The Court has found that in early December 1981 the Defense Counsel approached the Staff Judge Advocate to determine the Government's receptiveness to a plea agreement leading to an approval of a Section F discharge.

The Staff Judge Advocate advised the Defense Counsel at that time that he was not amenable and on behalf of the Government he would not recommend approval of a Section F.

Later in December the Defense made a new offer including that the accused would plead guilty, that he would testify against Simon, and that the accused would cooperate with the OSI in regard to drug investigations. Again the Defense Counsel sought Section F approval and in the alternative reduction to a Special Court-Martial. The Staff Judge Advocate on behalf of the Government rejected the possibility of either such agreement but indicated the possibility of a sentence limitation of a year to year and a half in confinement.

No attempt was made by the parties to formalize the agreement or to specify the terms of any agreement that either party might have thought existed.

It's the court's view of the evidence that the parties were stating negotiating posi-

tions and that the position that was reached at this time was that if the accused testified against Simon and if the accused was willing to plead guilty, and if the accused cooperated regarding drug investigations, the Staff Judge Advocate would be open to a plea agreement. The terms of which were as yet unspecified.

The parties at that time in December simply were stating their positions. They did not endeavor to clarify or agree to what the word cooperate with the OSI meant. They did not specify or agree as to the scope or kind of cooperation envisioned by each party. It was apparently left open for later negotiations as to what would satisfy such a condition. The SJA did however state one year or one and a half years of confinement as an indication to the Defense of terms which he would apparently support if the accused's cooperation with the authorities was in his determination meaningful.

On the 23rd of December on this basis then the Staff Judge Advocate discussed immunity for the accused with the convening authority and such immunity was granted. Between the 23rd of December and approximately 24 February, the accused did cooperate with the OSI. The Defense Counsel, Capt Marable, contacted the Staff Judge Advocate to further coordinate the negotiations, to coordinate the extent of cooperation of the accused, and to further negotiate a benefit to his client.

At that time the Defense Counsel sought approval of a Section F discharge. The Staff Judge Advocate again stated that he was not receptive to a Section F discharge. He did, however, indicate a willingness to consider recommending a Special Court-Martial.

As of that date, however, the Staff Judge Advocate indicated only a willingness and not a commitment to go to a Special Court-Martial. I should clarify that, a willingness to consider as opposed to a willingness to actually proceed with a Special Court-Martial.

On or about the 24th of February the Defense Counsel again contacted the Staff Judge Advocate. At that time the Defense

Counsel related to the Staff Judge Advocate what he, the Defense Counsel, believed to be the extent of the accused's cooperation with the authorities at that time. The information provided by the Defense Counsel to the Staff Judge Advocate was not completely accurate and was inaccurate in important aspects. The Staff Judge Advocate indicated that the accused would get a Special Court-Martial, that he might well get approval of a Section F discharge if things quote if things pan out unquote.

The Court has concluded that the accurate interpretation of that statement was that the SJA was stating an indication based on what the Defense Counsel said to him, that the Staff Judge Advocate at that time could not approve or decide a pretrial agreement and this was known to both parties. The Staff Judge Advocate further was not likely at that point to commit to any agreement based on the informal and unofficial advice of the Defense Counsel without staffing the question with the Office of Special Investigations. This was reasonably known to both parties as well.

The Court has concluded that this conversation amounted to a coordination of the progress of the accused's cooperation. It was a communication as to the realm of possibilities of a pretrial agreement. It expressed the Staff Judge Advocate's view that the increased participation of the accused increased—increased the scope of possible agreements, and specifically indicated that approval of a Section F was now possible in light of the accused's increased cooperation.

The statement in regard that the accused would get a Special Court-Martial is not viewed by this court as a commitment to the Defense Counsel or to the accused but rather as a statement of the SJA's conclusion that the accused had on the basis of his cooperation as stated by the Defense Counsel at that time done the types of things that would qualify him for such approval. It was not an agreement. No terms were specified. The negotiations continued and now the negotiating positions included an understanding by both parties that a guilty

plea would be required, that testimony against Simons—or the availability to testify against Simons would be required and that cooperation regarding drug investigations was required.

At that time the Staff Judge Advocate viewed the word cooperation as meaning cooperation leading to apprehension and military justice action in regard to military members; and in regard to Mr. King that it—cooperation referred to civilian criminal prosecution of King or termination of King's employment by the Department of Defense.

The Defense Counsel viewed the word cooperation at that point as being at least a good faith effort by the accused to assist the OSI. It's the court's conclusion that the Defense Counsel knew and understood that the quality of the cooperation by the accused would have a direct bearing on the extent of Government leniency.

At this point then the word cooperation was still as yet undefined. At this point in time there had been no authority or agreement from the convening authority and there had been no indication from the Staff Judge Advocate that the convening authority had agreed. The Staff Judge Advocate did brief the convening authority. At that time the convening authority indicated receptiveness to the matters as stated by the Staff Judge Advocate. The convening authority believed that no agreement had yet been reached but that pre-agreement negotiations and communications were continuing.

In May of 1982, the Defense Counsel again contacted the Staff Judge Advocate. The Staff Judge Advocate at that time stated his position that if the accused cooperated with the authorities and specifically stated that that included testifying if necessary at the trials of the military members, that the Staff Judge Advocate would then be— would then process a Section F application with his support. The court finds consistent with the Defense Counsel's testimony that the Staff Judge Advocate stated to the Defense Counsel in May words to the effect that have the accused available to testify and we'll process the Section F. At this time there was no agreement regarding Special Court-Martial.

The Court finds consistent with the testimony of the accused that in April the accused knew and understood that his testimony was a required part of his cooperation and at that time the accused was willing to so testify.

\* \* \* \* \* \*

As of the date of approximately 10 May 1982, it was the position of the Staff Judge Advocate on behalf of the Air Force that first the accused had been available to testify at the Simon trial, that second that assistance regarding Mr. King was no longer a part of the negotiations as it appeared evident to the OSI at that time that King was not going to be sufficiently open to an undercover operation involving the accused. Third that any pretrial agreement would have to include an agreement to plead guilty and fourth, that such an agreement could be arrived at if the accused was available to testify against the military members against whom he had worked undercover.

If these conditions were met, then the Staff Judge Advocate would support a Section F discharge and the Staff Judge Advocate was reasonably certain that the convening authority would be receptive to approval of such a discharge. Such positions were prefatory to a pretrial agreement as contemplated in the terms of Air Force Manual 111–1.

The comments of OSI Agents and Capt Feder and others to the accused or his counsel in regard to their understanding of the terms of an agreement were not promises or negotiations or commitments but were rather unauthorized statements on their parts as to what they understood to be the status of agreements between the accused and the Staff Judge Advocate.

The accused did not understand the statements of these parties to indicate promises on their behalf or commitments from them. He did not believe that Capt Feder accurately reflected the terms of the agreement—or any agreements with the authorities.

The comments of the Staff Judge Advocate to the OSI and other members of his staff did not indicate promises or indicate agreement or commitments to the accused. They were, however, candid indications of his unilateral intentions not amounting to assurances or commitments to the accused.

In mid-June 1982 before any threats were received by the accused, the accused told Sgt Preston that he'd done all he was going to do. The undercover operation with the OSI had ended at the end of April approximately six weeks before such statements were made by the accused. No further undercover work had been performed by the accused during that time. Under these circumstances the indication by the accused that he had done all he was going to do was an indication that the accused did not intend to testify in the trials.

On 29 June the accused told a Sergeant at Hill Air Force Base and subsequently Special Agent Wise that he did not intend to testify in the trials of the military people who he had identified.

On 2 July 1982 the accused again told Sgt Preston that he didn't want to do any more, that he had done all he intended to do. Under those circumstances the Staff Judge Advocate honestly and reasonably concluded that he could no longer reasonably rely and act—that he could no longer reasonably take important and significant military justice actions based on the accused's stated intention not to testify. Therefore the Staff Judge Advocate was no longer willing to support a Section F discharge and he advised the accused and Counsel that he was no longer willing to do so.

The accused in his statements to Sgt Preston subsequent to his pretrial confinement indicated that he no longer believed there was an agreement.

The Defense Counsel—Defense Counsel's actions indicated that given the information provided to him by the Staff Judge Advocate in regard to the accused's repudiation of an intention to testify, the Defense Counsel's actions as that time indicated that the Defense Counsel no longer believed that there was an agreement.

All parties viewed the accused's unwillingness to testify as removing an essential pre-condition of agreement for Section F and all parties viewed that such a situation reopened general negotiations.

Col Rudland unilaterally evaluated the matter and apparently felt that although the accused had cooperated to a lesser degree than hoped for, Col Rudland was still willing to support a pretrial agreement of lesser proportions. Col Rudland briefed the convening authority and the convening authority expressed receptivity to a pretrial agreement and gave authority for further negotiations. The convening authority at that time indicated his intention and willingness to approve an agreement which would provide for a General Court-Martial with a sentence limitation of a bad conduct discharge, confinement at hard labor for 6 months, total forfeitures of pay and allowances, and reduction to airman basic and which would include an agreement by the accused to plea guilty. Such statement would include an agreement by the accused to plea guilty. Such statement by the convening authority was not an agreement because there had been no communication with the accused or his counsel. But it was a statement by the convening authority to his legal advisor of his willingness to approve an agreement in such terms.

The Staff Judge Advocate communicated these possible terms to the Defense Counsel as part of the ongoing negotiations. The Defense Counsel expressed openness and willingness to formalize an agreement in such terms with a writing. Upon further evaluation, however, the Defense Counsel considering his notes, his memory, and his client's statements as early as 2 July that he was willing to testify, the Defense Counsel thus reconsidered his willingness to enter into a pretrial agreement of the stated terms and expressed his belief to the Staff Judge Advocate that an agreement had already been reached and that such an agreement was binding on all parties.

As of this date the accused remains willing to testify at the trials of other military members against whom he had worked un-

dercover. When I say remains that is not to negate my earlier findings that the accused on an earlier occasion reputed such willing—repudiated such willingness. However, at the time of this trial now he has expressed a willingness to so testify.

No pretrial agreement binding on either party was arrived at any time during these negotiations. The Court views the communications among the parties as being a succession of prefatory negotiations and statements of position.

During the course of such negotiations, the negotiations were seen by the parties as prefatory to a written binding agreement and during the course of such negotiations the parties did not view the negotiations as being final or enforceable until such written agreement was concluded.

This concludes my findings in regard to the Defense's motion.